BENJAMIN B. WAGNER
United States Attorney
JEAN M. HOBLER
JASON HITT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

ANDREW SIGLER
Trial Attorney, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    v.<br><br>NICHOLAS TEAUSANT,<br><br>             Defendant. | CASE NO. 2:14-CR-0087 JAM<br><br>GOVERNMENT'S NOTICE OF MOTION AND MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER AUTHORIZING PRETRIAL RELEASE FOR DEFENDANT NICHOLAS TEAUSANT<br><br>DATE: May 13, 2014<br>TIME: 1:30 p.m.<br>COURT: Hon. John A. Mendez |

The United States of America, by and through its attorney, Assistant United States Attorney Jason Hitt, moves pursuant to 18 U.S.C. § 3145(a) for revocation of the ruling of April 17, 2008 ruling by United States Magistrate Judge Claire authorizing the pretrial release of defendant Nicholas TEAUSANT.

This motion is based upon the attached Memorandum of Points and Authorities, Exhibit A, incorporated here by reference, and any evidence and argument which may be presented at a hearing on this matter.

Dated: May 9, 2014                                                BENJAMIN B. WAGNER
                                                                              United States Attorney

                                                                 By:  /s/ JASON HITT
                                                                              JASON HITT
                                                                              Assistant United States Attorney

BENJAMIN B. WAGNER
United States Attorney
JEAN M. HOBLER
JASON HITT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

ANDREW SIGLER
Trial Attorney, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:14-CR-0087 JAM |
|---|---|
| Plaintiff, | GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER AUTHORIZING PRETRIAL RELEASE FOR DEFENDANT NICHOLAS TEAUSANT |
| v. | |
| NICHOLAS TEAUSANT, | |
| Defendant. | DATE: May 13, 2014<br>TIME: 1:30 p.m.<br>COURT: Hon. John A. Mendez |

**RELIEF SOUGHT**

Pursuant to 18 U.S.C. § 3145(c), the United States, by and through Assistant United States Attorney Jason Hitt, moves to revoke the Magistrate Judge's Order of May 7, 2014, releasing defendant Nicholas TEAUSANT ("defendant") based upon a bond partially secured by an investment property. The United States seeks an Order finding that the defendant cannot overcome the statutory presumption that he is a flight risk and danger to the community, and, therefore, he should remain detained pending trial.

## SUMMARY OF ARGUMENT

This Court should revoke the Order granting defendant's pretrial release because the Bail Reform Act's presumption of detention is amply supported by a preponderance of the evidence demonstrating that the defendant is a flight risk because his last acts before his recent arrest included: (1) cutting ties with his family and boarding a train with his passport and a bag packed for Syria; (2) traveling more than 600 miles from California to within a few hundred feet of the Canadian border; and (3) attempting to enter Canada in order to arrange travel to Syria where he intended to engage in armed acts of violence. The Court should further find by clear and convincing evidence that the defendant poses a danger to the community because in addition to his affirmative attempts to leave the country to engage in violent acts he described as "betraying" and "bombing" the United States, he openly discussed the murder of his mother and stepfather, wishing only for an "excuse" to begin that plan. The proffered property to secure defendant's release, a condominium investment property owned by the defendant's stepmother's father, is no way meaningful collateral. The defendant has shown no attachment to his stepmother, much less her father, and it is wholly unclear that defendant's stepmother's father's potential loss of this condominium would in any way motivate the defendant to appear for matters in this case or to refrain from attempting to smuggle himself out of the country, as he had discussed doing if the CHS did not assist him in his goals of reaching Syria and engaging in jihad.

More importantly, no amount of posted collateral can protect the public from the significant risk that the defendant's unpredictable behavior will result in harm to his mother, his stepfather, his one-year old daughter, his grandparents, law enforcement officials who may be required to respond to his erratic behavior, residents in the neighborhood where he would be released, and anyone in the community who the defendant disdainfully views as "kufars."[1]

---

[1] The term "kufar" is a derogatory term meaning infidel or non-believer.

# DETENTION HISTORY

### March 17, 2014 - Initial Detention Determination by Chief Magistrate Judge Tbeiler

The defendant's custody status was initially determined by Chief Magistrate Judge Mary Alice Theiler in the Western District of Washington on Mach 17, 2014. (Docket 4.) Magistrate Judge Theiler found that the defendant was a flight risk and danger to the community. She ordered him detained and transported to the Eastern District of California. (Id. at 8-10.)

### April 14, 2014 – Magistrate Judge Brennan Orders Defendant Detained

On April 14, 2014, the defendant made his initial appearance in the Eastern District of California. During a detention hearing before Magistrate Judge Brennan, the government moved for detention on the basis of flight risk and danger. The defendant submitted the issue. Magistrate Judge Brennan ordered the defendant detained on both grounds and issued a detention Order. (Docket No. 14.)

### May 7, 2014 - Detention Hearing Before Magistrate Judge Claire

The defendant requested a review of his detention status through a noticed filed on May 2, 2014. On the morning of the day requested for the hearing, May 7, 2014, the defendant filed a ten-page motion for bail review. (Docket No. 19.) The court held a hearing on the defendant's motion in the afternoon of May 7, 2014. (Ex. A.)

During the hearing, Magistrate Judge Claire ruled that the detention presumption applicable in this case was overcome by a $200,000 bond secured only by $92,000 available equity in an investment property owned by the father of the defendant's step-mother. (Id. at 10.) According to the conditions set by the Magistrate Judge, the defendant would be required to reside with his grandparents. (Id.) At the government's request, the Magistrate Judge ruled that her release order would be stayed in order to permit review by this Court. That stay remains in effect until this Court conducts a de novo review of the matter. (Id. at 11-12.)

### The Government's Motion to Revoke the Release Order

Pursuant to 18 U.S.C. § 3145(c), the government moves to revoke Magistrate Judge Claire's order of May 7, 2014, releasing the defendant on a partially-secured $200,000 bond and renews its motion for detention of the defendant pending trial on both flight risk and danger grounds.

# ANALYSIS

**Standard of Review on a Motion to Revoke Magistrate's Release Order**

A district court conducts a de novo review of a Magistrate Judge's bail ruling. United States v. Koenig, 912 F.2d 1190, 1191 (9th Cir. 1990). The district court is required to "review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." Id. at 1193. If the performance of the district court's function "makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate." Id. at 1193.

**Applicable Detention Statutes and Presumption of Detention**

Congress empowered judicial officers to release or detain defendants pending trial. 18 U.S.C. § 3141(a). Detention determinations proceed pursuant to the terms of 18 U.S.C. § 3142. Within § 3142, Congress determined that certain crimes carry a presumption that the defendants should be detained pending trial. See 18 U.S.C. § 3142(e) (imposing a presumption of detention for defendants facing certain drug trafficking crimes, crimes of violence, and terrorism charges).

Where, as here, probable cause exists to believe that the defendant has committed a "[f]ederal crime of terrorism," there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."18 U.S.C. § 3142(e).[2] United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008).

**Flight Risk Standard - Preponderance of the Evidence**

Whether to detain a defendant as a flight risk pending trial is made by a preponderance of the evidence. United States v. Motamedi, 767 F.2d 1403, 1407 (9th Cir. 1985).

**Danger to the Community Standard - Clear and Convincing Evidence**

"A finding that a defendant is a danger to any other person or the community must be supported by 'clear and convincing evidence." Hir, 517 F.3d at 1086.

---

[2] The defendant is charged with attempting to provide material support and resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1), an offense identified as a ''[f]ederal crime of terrorism'' under 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of fifteen years in prison is prescribed.

**The Presumption's Interplay with the Statutory Detention Factors - 18 U.S.C. § 3142(g)**

"If a defendant proffers evidence to rebut the presumption of [flight risk and] dangerousness, the court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged, including whether the offense is a federal crime of terrorism; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." Id. (citing 18 U.S.C. § 3142(g)).  "The presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).'" Id. (quoting United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986)).  As discussed, each statutory factor favors detention.

**Nature and Circumstances of the Offense Charged – 18 U.S.C. § 3142(g)(1)**

This factor supports detention.  The Indictment charges the defendant with attempting to provide material support and resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1).  As detailed in the lengthy affidavit in support of the Criminal Complaint, the defendant engaged in a persistent, five-month effort to secure travel to Syria in order to engage in acts of terrorism.  It was his sole focus.  Indeed, long before the defendant made contact with the law enforcement, his social networking posts repeatedly expressed a desire to be part of America's downfall, conduct violent jihad, and obtain the "Lone Mujahid Pocketbook," a how-to guide for becoming a lone wolf terrorist.  (Compl. ¶¶ 14, 17.)  The defendant manifested his desire to act on his beliefs beginning on October 5, 2013, the date of his first meeting with the CHS.  Between October 5, 2013, and March 16, 2014, the defendant met with the CHS on nine separate occasions.  During those meetings, the defendant expressed a desire to carry out a number of violent acts.  These included:
(1) bombing the Los Angeles subway system, Compl. ¶ 30, (2) bombing his one-year old daughter's daycare center because it was a "Zionist reform church," Id. ¶ 32(b), and (3) putting a bullet in his mother's head, Id. 32(g).  The defendant also explained how he would deceive his mother about his plan

to travel to Syria. (Compl. ¶ 35(d).) In particular, he told the CHS that he would smuggle himself out of the United States if needed. (Id.)

The months of meetings and discussions were not idle chatter. Late in the evening on March 15, 2014, the defendant began a lengthy journey from Lodi, California, to the Canadian border. (Id. ¶ 44.) He had purchased an Amtrak ticket to take him to Vancouver, Canada, where, he believed, members of a terrorist network would assist him in reaching Syria to fight with the terrorist group known as ISIS. (Id. ¶¶ 37-39.) The defendant traveled through northern California, Oregon, and Washington, before FBI agents arrested him, just short of the Canadian border. (Id. ¶ 44-47.) At the time of his arrest, the defendant was seated in a bus in Blaine, Washington, prepared to cross the Canadian border with his passport. (Id. ¶ 47.) These facts support the presumption of flight risk and danger because they demonstrate the defendant's willingness to leave the United States with an intent to commit terrorist acts in a foreign country.

**Weight of the Evidence Against the Person – 18 U.S.C. § 3142(g)(2)[3]**

This factor favors detention. The evidence against the defendant is difficult to overcome because it consists of multiple recorded face-to-face conversations corroborated by surveillance, evidence seized from the defendant's laptop, the defendant's lengthy trip to the Canadian border, the defendant's post-arrest confession, and other such evidence produced in discovery.

---

[3] The United States recognizes the unique Ninth Circuit holding that the weight of the evidence is the least important factor to the detention analysis, but the Court should certainly consider the evidence factor in reaching its decision. Motamedi, 767 F.2d at 1405; but see United States v. Ward, 63 F. Supp. 2d 1203, 1208 n.6 (C.D. Cal. 1999) (explaining origin of Motamedi rule is an unsupported statement in pre-1984 Bail Reform Act case, United States v. Honeyman, 470 F.2d 473, 474 (9th Cir. 1972)).

**History and Characteristics of the Person – 18 U.S.C. § 3142(g)(3)[4]**
**Nature and Seriousness of the Danger to any Person or the Community – 18 U.S.C. § 3142(g)(4)**

Each of these factors support detention.  During nine separate meetings between October 2013 and March 2014, the defendant expressed a desire to (1) bomb the Los Angeles subway system, (2) bomb his daughter's daycare center, and (3) put a bullet in his mother's head.  These facts provide evidence that the defendant has threatened or poses a danger to the community and to specific, identifiable individuals under 18 U.S.C. § 3142(e).  Moreover, the defendant has no employment history and routinely abused marijuana for the last three years.  He cannot be ordered to attend classes at Delta College because he presents a danger to the student body at the school.  He cannot be ordered to find gainful employment because, given his view of non-Muslims, he presents a danger to the public.  Moreover, the defendant's recently-disclosed mental condition makes him unsuitable for conditions of release.

The defendant's brief reveals that he is now being treated with a powerful antipsychotic drug for an undisclosed condition with unknown side effects.  The government does not have access to additional information other than what has been disclosed by the defense but, certainly, routine administration of an antipsychotic drug requires professional medical supervision, particularly where the condition was apparently undiagnosed prior to his arrest in this case.  If the defendant is released and decides that he no longer wanted to take the prescribed medication, or if he suffers from hallucinations or other such side effects from taking the drugs, the proposed custodians would be placed in an incredibly difficult position.  Should the defendant have a violent outburst, the defendant, his custodians, their neighbors, and any law enforcement or medical personnel called to respond to an episode would be endangered.

The defendant does not address the type of conditions that would keep the public safe and, instead, attempts to mitigate the seriousness of the criminal charge.  He asserts that the CHS "groomed" him for terrorist work and fed him information about engaging in terrorist activity.  This drastically misstates the evidence.  Indeed, on multiple occasions the CHS and, later, the UC, gave the defendant

---

[4] This category includes consideration of the defendant's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse.  18 U.S.C. § 3142(g)(3).

multiple opportunities to turn away from engaging in criminal terrorist acts.  Each time, the defendant responded emphatically that he would not be deterred.  For example, during a January 4, 2014 meeting, the CHS asked that the defendant take time to decide what he really wanted.  (Compl. ¶ 32(f).)  The defendant's response was unequivocal.

> [W]ell you know if you tried to stop me I'd find another way around you…. If someone tried to stop me, I'd find my own way to do it.  [UI] I'll either go there by myself and struggle and eventually get there late to the fight and still get there or you know, you know either way I'm going to either try trying to go so [UI].

(Id.)  During this same meeting, the defendant made clear what he was willing to do in order to carry out his planned terrorist acts.  In particular, the defendant said that if his mother were to "jeopardize something that I had going, I would do what I needed to do," continuing by saying, "If I needed to, I would kill her.  I love her, but she's still a kufar [infidel or non-believer]."  (Id. ¶ 32(g).)  The defendant mentioned the possibility of simply tying her up, but stated "it's just easier to put a bullet in the head" because "if you tie someone up, then you got to worry about them screaming or [UI] sooner before you get there."  (Id.)

Similarly, during a February 22, 2014 meeting, the CHS told the defendant that if he decided not to proceed, they would still be friends.  (Id. ¶ 37(c).)  The defendant responded "you can stop that train of thought."  (Id.)  He continued, "I prayed about it like you said.  My resolve is pretty clean cut."  (Id.)  At the end of the meeting, the CHS reiterated that "if it comes out that you don't want to go, right, we'll still be friends…. [I]t's okay to choose one way or the other."  (Id.)  The defendant responded, "I already chose" and continued that it "still kind of feels like you're, like, trying to push me not to."  (Id.)

A third example underscores the defendant's commitment to his criminal path.  During a meeting with the UC on March 5, 2014, the UC explained that the battlefield the defendant was seeking out was chaotic, unclear, and that sometimes women and children were dying.  (Id. ¶ 38(d).)  The defendant replied that he was undeterred by this information.  (Id.)  The meeting concluded with the UC advising the defendant that he had two days to think about it and if he changed his mind he should call the CHS.  (Id. ¶ 38(f).)  The defendant responded that he had told CHS numerous times that he was ready to go and that CHS "really need[ed] to stop asking" if the defendant was sure.  (Id.)  None of these private meetings was the product of social media.  These were face-to-face meetings with individuals the

GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR REVOCATION OF RELEASE ORDER

8

defendant believed were going to assist him in committing terrorist acts.

Far from grooming the defendant, law enforcement in the undercover setting tried to impress upon the defendant the very serious nature of what he proposed to do and repeatedly offered him the opportunity to withdraw at any time without losing face.  One shudders to think what the defendant might have done had he encountered real terrorist operatives who would have encouraged his terrorist aims and assisting him in carrying them out.

The defendant attempts to explain the disturbing nature of his dark ideations by claiming that he is "a classic product of the social media era." (Def. Mot. at 8.)  Such a flippant explanation fails to account for why the defendant would confide in the CHS during private meetings that he would tie up his mother and put a bullet in her head and five or six bullets in his stepfather if they ever obstructed his plans for engaging in terrorist activity.  These admissions were not made over social media and, even if they had been, they would be just as disturbing.[5]  As an example of the defendant being a "classic product of the social media era," the defendant cites his appearance on a local news show shortly before his arrest.  (Id. at 9-10.)   The news appearance, however, raises some significant concerns and runs counter to the defendant's attempt to shift the blame on the CHS.

It was the defendant, not social media or the CHS, who decided to be interviewed by the media. The defendant's own brief describes the defendant's unpredictability and deceit to accomplish what he wants. Simply put, the Court should not take the risk of releasing someone like the defendant because it places an enormous burden on the custodians and the Pretrial Services Officer.  It is worth noting that the defendant spent months meeting with the CHS and surreptiously left for Canada all while living with his mother.  The defendant is not capable of being meaningfully supervised under any conditions or combination of conditions.

The security proposed, a $92,000 investment property owned by the defendant's stepmother's father, is inadequate to address flight risk or danger.  This investment property is not meaningful collateral that would impart upon the defendant the seriousness of fleeing.  In addition, any amount of

---

[5] The Magistrate Judge appeared to believe that all of the defendant's threats were limited to online activities. (Ex. A at 7.)  Specifically, the Magistrate Judge said the internet was the "only forum in which any, what might be characterized as threatening behavior, has taken place to date." (Id. at 7:23-25.)

bond would be inadequate to eliminate danger concerns.  Moreover, it is worth noting that the proposed surety owns his own residence in Ashland, Oregon.  When asked by Pretrial Services whether he would be willing to post that property as security, he said no.  The surety's residence is precisely the type of meaningful collateral that courts typically seek when considering a release package and this surety's unwillingness to post his residence is deeply troubling in such a serious case.

## CONCLUSION

For the reasons set forth in this motion, the attached and incorporated Exhibit, and any evidence or argument presented at a hearing on this motion, this Court should revoke the revoke the Magistrate Judge's Order of May 7, 2014, releasing the defendant.  This Court should further find that the defendant cannot overcome the statutory presumption because he is a flight risk and danger to the community and, therefore, he should remain detained pending trial.

Dated: May 9, 2014

BENJAMIN B. WAGNER
United States Attorney

By: /s/ JASON HITT
JASON HITT
Assistant United States Attorney