PHILLIP A. TALBERT
Acting United States Attorney
JEAN M. HOBLER
JASON HITT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>                    v.<br><br>NICHOLAS MICHAEL TEAUSANT,<br><br>       aka, Assad,<br><br>                              Defendants. | CASE NO.  2:14-CR-00087 JAM<br><br>GOVERNMENT'S SENTENCING MEMORANDUM<br><br>DATE:        June 7, 2016<br>TIME:        9:15 a.m.<br>COURT:      Hon. John A. Mendez |

**GOVERNMENT'S SENTENCING MEMORANDUM**

# TABLE OF CONTENTS

I.  SUMMARY OF GOVERNMENT'S POSITION ..................................................1

II.  FACTUAL BACKGROUND ..................................................................................2

    A.  Teausant's Background .......................................................................2

    B.  Teausant's Military Experience ..........................................................2

    C.  Pre-October 2013: Teausant's Statements on Publicly Available
        Social Media .......................................................................................3

    D.  October 2013:  Teausant Meets the CHS and Rapidly Expresses
        His Desire to Fight in Syria ................................................................4

    E.  November 2013: Teausant Meets UCE1; Teausant and the CHS
        Continue their Conversations ..............................................................6

    F.  December 2013: Teausant Posts About ISIS, Hatches and Abandons the
        LA Subway Idea, Gets Spooked that UCE1 is FBI, and
        Returns to Plans with the CHS ...........................................................9

    G.  January 2014: The CHS Asks Teausant Which of the Many Ideas He's
        Espoused He Really Wants to Do, and Teausant Returns to his
        Desire to Fight in Syria ....................................................................12

    H.  February 2014: Teausant Continues Pursuit of to His Plan to
        Fight in Syria ....................................................................................13

    I.  March 2014:  Teausant Meets UCE2, Buys His Ticket, and Travels ........................15

        1.  The Meetings ..........................................................................15

        2.  The Travel ...............................................................................19

    J.  March 16-17, 2014: Teausant is Stopped at the Border, and Interviewed .................19

    K.  Teausant's Post Arrest Interest in Terrorism and ISIS ...........................20

III.  THE PRESENTENCE INVESTIGATION REPORT .................................................21

IV.  THE SECTION 3553 FACTORS .............................................................................21

    A.  18 USC § 3553(a)(1). .......................................................................21

        1.  The History and Characteristics of the Defendant .............................21

        2.  The Nature and Circumstances of the Offense .................................22

    B.  18 U.S.C. § 3553(a)(2), the need for the sentence imposed— ......................................23

1.    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;.....................................23

2.    (B)  to afford adequate deterrence to criminal conduct;.......................................23

3.    (C)  to protect the public from further crimes of the defendant; and...................23

4.    (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;.......................................................................................24

C.    18 U.S.C. § 3553(a)(3): the kinds of sentences available;...............................24

D.    18 U.S.C. § 3553(a)(4)  the kinds of sentence and the sentencing range established for—(A)  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines. .............................24

E.    18 U.S.C. § 3553(a)(6)--the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct..............................................................................................................25

F.    18 U.S.C. § 3553(a)(7)--the need to provide restitution to any victims of the offense..............................................................................................................25

V.    **THE GOVERNMENT'S RECOMMENDATION** ....................................................**25**

**Table of Exhibits**

Note:  The sentencing exhibits are keyed to the portion of the brief in which they are referenced first.

| Exhibit | Description |
|---------|-------------|
| II.B-1 | Military Enrollment Document |
| II.B-2 | Delta College Transcript |
| II.C-1 | Ask.fm excerpts |
| II.D-1 | CHS Reporting of Oct. 20, 2013 |
| II.D-2 | CHS Reporting of Oct. 28, 2013 |
| II.E-1 | Instagram Postings, Nov. 2013 |
| II.E-2 | CHS Reporting of Nov. 18, 2013 |
| II.E-3 | Transcript Excerpts, Nov. 21, 2013 |
| II.E-4 | Excerpt (audio) filed under seal |
| II.F-1 | Transcript Excerpts, Dec. 12, 2013 |
| II.G-1 | Transcript Excerpts, Jan. 4, 2014 |
| II.G-2 | CHS Reporting of Jan. 7, 2014 |
| II.H-1 | Transcript Excerpts, Feb. 1, 2014 |
| II.H-2 | Transcript Excerpts, Feb. 10, 2014 |
| II.H-3 | CHS Reporting of Feb. 11, 2014 |
| II.H-4 | CHS Reporting of Feb. 22, 2014 |
| II.H-5 | Transcript Excerpts, Feb. 22, 2014 |
| II.I-1 | Transcript Excerpts, Mar. 5, 2014 |
| II.I-2 | Transcript Excerpts, Mar. 5, 2014 |
| II.I-3 | CHS Reporting of Mar. 8, 2014 |
| II.I-4 | Transcript Excerpts, Mar. 7, 2014 |
| II.I-5 | Transcript Excerpts, Mar. 8, 2014 |
| II.I-6 | CHS Reporting of Mar. 10, 2014 |
| II.I-7 | Facebook Messages, Postings, Mar. 2014 |

| | |
|---|---|
| II.I-8 | CHS Reporting of Mar. 15, 2014 |
| II.I-9 | Transcript Excerpts, Mar. 15, 2014 |
| II.I-10 | Transcript Excerpts, Mar. 17, 2014 |
| II.J-1 | Transcript Excerpts, Mar. 17, 2014 |
| II.K-1 | Transcript Excerpts, Sacramento Bee Interview, Aug. 26, 2014 |
| IV.A-1 | Transcript Excerpts, Mar. 17, 2014 |
| IV.A-2 | Facebook Connections |
| IV.B-1 | Letter from Bureau of Prisons |
| IV.B-2 | Press Release re: Faisal Mohammed |

# I.   SUMMARY OF GOVERNMENT'S POSITION

Nicholas Teausant is a young man with a troubled background.  PSR ¶¶ 69-79.  While his aggressive outlook and pattern of self-aggrandizing lies can be understood as a product of a troubled childhood and mild cognitive and moderate social impairments, understanding how he got to where he is does not excuse the actions he undertook to join what he knew to be a violent terrorist organization. Teausant did his research.  He knew the "worst" the United States could do to him for his plans to join ISIS was put him in prison for 15 years.  He was right.  Under Title 18, United States Code section 2339B, the maximum possible term of imprisonment is 15 years.

Teausant's actions cannot be explained as a young man trapped on a ride he could not exit. Teausant wanted to go to Syria and fight before he ever encountered the FBI.  Teausant identified ISIS as the group he wanted to fight with, identifying ISIS as a group "they" call terrorists and wanting to travel quickly so he could join in ISIS offensives against the Free Syrian Army.  The CHS and the UCEs all urged Teausant to think about what he really wanted and be sure about his chosen path.  But Teausant stayed his course.

While Teausant was a young man with a troubled childhood, at the time of his crime he was an adult with the capacity to understand what he was undertaking; and the evidence shows he actually understood what his undertaking.  Whether his motive was attention, aggression, a sincere (or insincere) attachment to a twisted understanding of Islam, or some combination of them all, Teausant made a knowing choice to try to join ISIS.

Under the Guidelines, 15 years is the sentence and anything less than 15 years is a variance.  USSG § 5G1.1(a) & commentary.  That said, Title 18, United States Code section 3553(a) requires that the Court look not only to the individual defendant, his history and characteristics and the nature and circumstances of his offense, but also to wider issues such as sentencing disparities, the seriousness of the offense, the need to protect the public from the defendant, deterring others from engaging in the same crime, and the provision of correctional care to the defendant.  Thus, while the presumptive sentence under the Guidelines is 15 years, the government acknowledges that a review of the specifics of this case may warrant a variance under Section 3553(a) to something less than 15 years of imprisonment.

The Presentence Investigation Report (PSR) recommends a guideline sentence of 15 years with a 10 year term of supervised release.  Given the factors of Section 3553, the government agrees that 25 years of supervision in one form or another is appropriate, but instead recommends a shorter period of incarceration and a longer period of supervised release:  9 years in prison and 16 years of supervision.  This is predicated on imposition of the recommended special terms of supervised release in the PSR, specifically including drug and alcohol and mental health treatment.  The government also recommends an added provision requiring Teausant to take psychiatric medication if and as indicated by medical professionals and as directed by his probation officer.  The government further endorses any behavioral, cognitive, and occupational therapy and drug or alcohol treatment available in custody and during the term of supervised release.

## II.   FACTUAL BACKGROUND

### A.   Teausant's Background

The PSR provides a thorough summary of Teausant's background, detailing a troubled childhood with divorced parents, whose primary custodian at a young age was drug addicted, with serious implications for Teausant's safety and development.  PSR ¶¶ 69-74.  While Teausant's prospects improved when he was transferred to his other parent's custody, the peripatetic lifestyle that ensued was perhaps not all the stability he needed after the chaotic early years.

As to his mental health, the most comprehensive analysis done to date, by the Bureau of Prisons, suggests that Teausant has mild cognitive and moderate social impairments, a significant impact from marijuana use, but no schizophrenia or other psychotic disorder.  PSR, Ex. 7.  The defense's second retained expert, Dr. Khazanov, concurs that there are mild cognitive and moderate social impairments, adding that there is evidence that there may be organic bases for these impairments.  None of Teausant's impairments, however, rise to the level of a defense to his crime.  PSR ¶ 92.

### B.   Teausant's Military Experience

In April 2012, Teausant, then 18 years old, enlisted in the U.S. Army National Guard.  On his enrollment paperwork, he opted to list his religious preference, indicating he was "Roman Catholic,"  and that he was not proficient in any foreign language.  Ex. II.B-1.  He never attended basic training, instead being required to complete 15 college credits.  PSR ¶ 103.

Teausant did not complete 15 college credits.  Altogether from the Summer of 2012 through the Fall of 2013, Teausant took 30 credit hours and successfully completed 10, earning As and Bs in most physical activity courses and "Parenting Children in Foster and Relative Care," a B in "Great Religions of the Western World," and failing or withdrawing from 'Beginning Water Fitness,' music, correctional science, nutrition, anthropology, art history, and United States history.  Ex. II.B-2.

As a result, although Teausant participated in some drills with the Guard, he never attended basic training and, at the time of his arrest, the Guard had released Teausant.

C.   **Pre-October 2013:**
     **Teausant's Statements on Publicly Available Social Media**

Starting at some point in or before May 2013, Teausant became vocal on social media with views strongly antagonistic to the United States.  The earliest entry the government has is from approximately May 1, 2013, on a website called ask.com.[1]  In response to the question "why don't you like america?" Teausant responded that he thought the land and its people were beautiful:

> but its the american government i hate, i don't like how they think they can get into everybodys business then commit acts of horror and when other people do it, its suddenly called terrorism and its a muslims fault right away even if it may have nothing to do with us, did you know that as a muslim in the army they do a check up on me every 6 months and interview my peers about how i am and if i still love my country they also ask me if i know how to build a bomb...lol yeh as if im going to tell them that, lol

PSR ¶ 11; *see also id.* ("Question: Which foreign country do you dislike the most? Answer: I live in it." (~June 1, 2013)); Ex. II.C-1, pp. 7-8.

As early as May 2013, Teausant was clear that he wanted to fight, and he wanted to do so in Syria. "I despise america and want its down fall but yeah haha. Lol I been [sic] part of the army for two years now and I would love to join Allah's army but I don't even know how to start."  PSR ¶ 12 (Instagram, May 31, 2013).   "Question: Where do you wanna go for fighting ...  Answer: … I want to go fight in Syria." Ex. II.C.1, at p. 4 (~Tue 06/25/2013); *see also* PSR ¶ 11 ("i would love to go 'help' in Syria…."

---

[1] All dates from ask.com (also known as ask.fm) are approximate because the website reports prior dates as, *e.g.*, "about three months ago."  Where quoted, information from ask.com and other social media sites is as in the original, capitalization, spelling, and grammar errors included.

(ask.fm, ~July 1, 2013)); *see also id.* ("i want to leave to become a Mujahideen." (ask.fm, ~July 1, 2013)); Ex. II.C-1, p. 2.

By August 2013, Teausant was actively seeking out the "lone Mujahid pocket book," an al Qaeda publication that gives ideas and instructions for engaging in terrorist attacks in one's home country.[2] PSR ¶ 12 ("Anyone know where I can get the 'lone Mujahid pocket book' #alqaeda#jihadist#jihad #islamicpride#muslim#mashallah #islam#allah#AllahuAkbar #thelonemujahid."). At some point he was successful in obtaining a copy, which was found on his laptop. PSR ¶ 36.

### D.    October 2013:
### Teausant Meets the CHS and Rapidly Expresses His Desire to Fight in Syria

Prior to October 2013, Teausant and the FBI had no contact with each other. It was on Saturday, October 5, 2013, that Teausant was introduced to the CHS by an individual unaware of and otherwise uninvolved in the investigation. PSR ¶ 13. Teausant invited the CHS to have breakfast the next morning. PSR ¶ 13. The two met in a restaurant on the morning of October 6, 2013. TEAUSANT volunteered that he read *Inspire* magazine,[3] followed extremist groups on line, and was a member of related forums. PSR ¶ 13. When the CHS asked TEAUSANT if his girlfriend knew he was on those sites, Teausant responded that she would tell the police about him if she knew. PSR ¶ 13. Teausant told the CHS that he had taken steps to conceal his identity when downloading *Inspire* and the Pocket Book. PSR ¶ 13.[4]

On October 20, 2013, Teausant and the CHS met and wandered around Stockton, California. In the course of this lengthy meeting, Teausant told the CHS that he wanted to go fight in Syria, but did not know how to get there. PSR ¶ 14. Teausant told the CHS that he was in contact with someone on-line who was from Afghanistan and was recruiting people to fight in Syria. Ex. II.D-1, p. 1. Teausant

---

[2] The document is available on the internet. Because the government does not wish to disseminate the document any more than it has already been, it does not attach a copy as an exhibit. However, a copy will be made available to the Court for its review without the necessity of risking infecting court equipment with malware that may be associated with viewing or downloading.

[3] *Inspire* magazine is an English language publication associated with al Qaeda. The Lone Mujahedeen Pocket Book largely is a compilation of the "how to" articles found in other issues of *Inspire*.

[4] Forensic examination of Teausant's laptop identified one issue of *Inspire* and the Lone Mujahedeen Pocket Book on that computer.

1    discussed with the CHS different types of bombs "they" needed to use in Syria, recommending smaller,

2    more powerful bombs. *Id.*

3         Through October 2013, Teausant continued to post violent extremist images and text on Instagram,

4    including a "hit list" of individuals "WANTED, DEAD OR ALIVE for crimes against Islam," with the

5    comment: "#wantedlist #mostwanted #killlist #hitlist #muslim #alhamduilliah #inshallah #muslim

6    #mujahideen #yeswecan #islamic #mashallah #allah #AllahuAkbar #mujahideen #bullets #pistol #guns

7    #killing #prophet #muhamad."  PSR ¶ 14.[5]  He also posted an image of one of the individuals on the "hit

8    list" being shot through the head (an obviously doctored image) with the caption: "YES WE CAN.  A

9    bullet a day keeps the infidel away.  Defend Prophet Muhammad peace be upon him," with the caption:

10   "#yeswecan #islamic #mashallah #allah #allahuakbar #mujahideen #bullets #pistol #guns #killing

11   #prophet #muhammad." NT-880-881 (Oct. 24, 2013).[6]  Finally, on the same date, Teausant posted:



22   PSR ¶ 14 (Oct. 24, 2013).

23        In a text message on October 28, 2013, Teausant advised the CHS that he was watching the

24   Military Channel, a program about explosives, and that he had step by step instructions to make the

---

26   [5] The government does not reproduce the image or attach it as an exhibit in recognition of the fact
     that some of the individuals on the list are still alive.  At least one, Stephane Charbonnie, publisher of
27   Charlie Hebdo, has been killed; others have been attacked, but survived.

28   [6] The government again refrains from republication of this image in respect of the living individual
     portrayed therein.

explosive C-4.  He told the CHS that he had many ideas to share in his mission to create "maximum fear,"
with the goal of watching the U.S. Government tumble and fall in the wake of a civil war.  Ex. II.D-2.  He
sent a link to the CHS of a video of Anwar Al-Awlaki's lecture, "The Battle of the Hearts and Minds," in
which al-Awlaki dissects U.S. government attempts to encourage moderate Muslim groups and dictates
that Sharia law imposed by Islamic governments is the only acceptable political state.[7]  PSR ¶ 14.

### E.   November 2013: Teausant Meets UCE1; Teausant and CHS Continue their Conversations

Teausant started the month of November 2013 by answering the question "if you could have any
question answered, what would it be?" with the response: "How do you bring America to its knees?" PSR
¶ 15 (ask.fm, ~ Nov. 1, 2013); Ex. II.C-1, p. 1.

On November 7, 2013, Teausant met for the first time with an undercover employee (UCE) of the
FBI, the first of two he eventually met with (therefore referred to here as "UCE1").  PSR ¶ 16.   UCE1
asked Teausant how he wanted "to serve Allah."  PSR ¶ 15.  Teausant's response:  "I'd like to be
mujahideen.  I want to fight for Allah and fight for our Muslim brothers and if God wills it and die for him
and be a martyr…. I'm not afraid of death, I welcome it. I'll be in a better place." PSR ¶ 15.  UCE1
advised Teausant that being a fighter was not the "only way to serve Allah," and asked if he had
considered the consequences.  PSR ¶ 15.  Teausant responded he was "willing to give up everything," and
"I know possible consequences and I know what could happen to me if I get caught, but I'm ok with it."
PSR ¶ 15.   Teausant stated he wanted to go fight in Mali against the French.[8]  PSR ¶ 15.

Teausant sold himself to UCE1 as a military-trained fighter with significant skills that would be
helpful in fighting with al Qaeda overseas.  PSR ¶ 15.  Notably, he advised that he had skills in setting
charges and knew how to make C-4 explosives.  PSR ¶ 15.  Teausant and UCE1 then engaged in a

---

[7] al-Awlaki was a dual citizen of the U.S. and Yemen.  On July 23, 2010, the United States
Department of Treasury announced that Awlaki was specially designated as a global terrorist under
Executive Order 13224 as a "key leader" of al Qaeda in the Arabian Penninsula (AQAP) and for
"supporting acts of terrorism and for acting for or on behalf of AQAP."  75 FR 43233-01.  He was killed
in Yemen in or about September 2011.

[8] In 2013, an al Qaeda affiliate in Mali, al Qaeda in the Islamic Maghreb, was engaged in open
hostilities with the country's government; France provided military support to the Malian government.
*See, e.g.*, http://www.reuters.com/article/us-mali-rebels-hollande-idUSBRE91104320130202 (Feb. 2013),
http://www.bbc.com/news/world-africa-24658349 (Oct. 2013).

1   conversational pattern that would be repeated multiple times between Teausant and both UCEs and the

2   CHS.  UCE1 told Teausant that he would think about what they had discussed, and advised Teausant to do

3   the same.  PSR ¶ 15.  Teausant interjected: "I know what you're going to say…. I'm not changing my

4   mind."  PSR ¶ 15.

5         In the meantime, the CHS and Teausant had more limited contact.  On November 17, 2013, ten

6   days after Teausant met with UCE1 for the first time, he texted the CHS advising the CHS that he should

7   not forget Teausant and that he'd met "my fellow Akhi [brother, *i.e.*, UCE1] who loves to give 'aid,'" and

8   continuing to advise the CHS that he didn't know how long he'd be alive in "this dunya [earthly

9   life/world], and before I die I want to do SOMETHING."  PSR ¶ 17; Ex. II.E-2.  The next day Teausant

10  advised the CHS that he had met with UCE1, and stated that with the help of UCE1 and a "mail brother"

11  he hoped to start a "Free aid program in the US for the western branch."  PSR ¶ 17.

12        Teausant's social media activity continued, with his November 17, 2013, Instagram post:



22  PSR ¶ 17 & Ex. II.E-1, pp. 1-2.  This post was met with a variety of comments suggesting that Teausant

23  had the wrong understanding of Islam.  One commenter who suggested that since Teausant had been

24  "kuffar," he would have been one of those killed before converting to Islam, and that therefore Teausant's

25  ideology was flawed.  Teausant's response: "Should have killed me." Ex. II.E-1, p. 3 (Dec. 17, 2013).

26        Shortly after this conversation with the CHS, Teausant posted on Instagram an enthusiastic

27  endorsement of the bombing of the Iranian Embassy in Lebanon stating: "kill all of bashars backers and

28  especially the kuffar scum and shia scum!! #alqaeda #taliban [etc.]"  PSR ¶ 18 (Nov. 19, 2013).  In the

comments, Teausant added:  "I fear not the US or its government I'm in its military but.I'll never hide my intentions and i support the Mujahideen whether they fight for #taliban or #alqaeda or even #alsham  I support them all."  PSR ¶ 18 (Nov. 19, 2013).

Two days later, Teausant met with UCE1 for the second time.  *See, generally*, PSR ¶ 19.  UCE1 asked Teausant whether he had thought about what he wanted to do.  Ex. II.E-3, p. 2.  Teausant advised that he was resolved, except that he had thought of another plan, "creating a western branch for [UI] in America," "like if we had our training program here…."  Ex. II.E-3, p. 2.  Teausant suggested embassies in America as targets, or military armories or recruitment centers in California.  PSR ¶ 19.  He acknowledged that he was "still open to go to Mali," but that something had "to happen here, … America in general."  PSR ¶ 19.  He cited *Inspire* as "always calling out to us in the West to do something here in America.  They are always asking us, pleading with us to do something here."  PSR ¶ 19.  He continued to discuss *Inspire* and its impact on him, citing it as the source of his information about France's military action in Mali and of the 'hit list' he previously posted on his Instagram account.[9]  Ex. II.E-3, p. 8.  He continued later in the conversation to discuss possible targets within the United States, including Los Angeles, Chicago, Wisconsin, Seattle, and the New York Stock Exchange.  Ex. II.E-3, pp. 11-12.

Teausant opined that violent extremist groups needed to be united, including ISIS:  "Because right now the way it is, is we have al Qaeda, we have al Sham, we have the Taliban, they're they're all separated.  But if they were to be united, it would be much more effective….  al Sham has their own flag, al Qaeda has their own flag, Taliban has their own flag.  But if you united them under the [UI] flag, the [UI] the white on black – just one flag, they represent themselves with all one flag, then you've created unity, … you've created something stronger."  Ex. II.E-3, p. 10; Ex II.E-4 (audio of this conversation documenting "al Sham", submitted under seal).  The ISIS flag is white on black, as shown in Teausant's Instagram post of December 2, 2013:

---

[9] In fact, both the "hit list," a discussion of the French intervention in Mali, and the photo with the caption "a bullet a day keeps the kuffar away," appear in the Spring 2013 issue of *Inspire*, which is available on line, and a hard copy of which is lodged with Court for its convenience.



Background of the week! #ISISS #islamicflag #mashallah #alhamduilliah #jihad #jihadist #mujahideen #muslim #muslimpride #thedeen #myummah

NT-0794-0795.

Toward the end of the conversation, Teausant essentially asked UCE1 to tell him what to do for jihad.  PSR ¶ 20.  UCE1 declined, telling Teausant that he had to choose his own path.  PSR ¶ 20.  UCE1 followed up, asking "where are we at now?  What are you thinking?" and heard from Teausant "I want to fight if that's an option…. But I would prefer to train [other fighters] if that was an option also."  Ex. II.E-3, p. 13-14.

**F.**   **December 2013:**
      **Teausant Posts About ISIS, Hatches and Abandons the LA Subway Idea, Gets**
      **Spooked that UCE1 is FBI, and Returns to Plans with the CHS**

In early December 2013, Teausant was documenting a growing affection for ISIS, beginning with his December 2, 2013, Instagram post of the ISIS flag, above, and continuing with this post:



#ISISS #islamic #islamicjihad #islamicflag #tugersofislam #muslim #mujahideen #AllahuAkbar #allah #islam

NT-0790-0791 (Dec. 3, 2013).  On the same day he posted:



I want to be the one in Red a big target for the kuffar so more of
them Come to me and I can kill them all! #muslim #jihad #jihadist
#mujahideen #AllahuAkbar #alhamduilliah #mashallah
#killthekuffar

NT-781-782.

On December 5, 2013, Teausant texted the CHS asking how he could get fireworks, "the big loud one! With the biggest boom and the one that's also compact!!"  PSR ¶ 22.  He continued later to ask the CHS not to go to Los Angeles in the near future and not to use the subway if he did. PSR ¶ 22.

The CHS contacted Teausant by phone the same day, and Teausant stated that he had gone camping with some "brothers" the weekend after Thanksgiving and hatched a plot to bomb the Los Angeles subway on New Year's eve or New Year's day.  PSR ¶ 22.  The next day, December 6, Teausant texted again, asking if he could get a "firework" that "won't set alarms off or is easy to hide... I'm not making my first one haha." PSR ¶ 22.  Teausant made his mindset at the time clear with an Instagram posting:



One day inshallah I'll be on this list at the Number 1 spot!!
#alhamduilliah #muslim  #terrorist #muslim #islamic #jihad
#mashallah

And in response to a later comment:

> Lol I relish the idea of killing thousands like 9/11 and make the
> Kuffar tremble at the knees and know who the real power in the
> world is!!

NT-0770-0771 (Dec. 7, 2013).

On December 12, 2013, Teausant met with UCE1 again and Teausant told UCE1 of his plan to bomb the Los Angeles subway in conjunction with New Year's festivities.  PSR ¶ 23.[10]  He discussed his plan to disguise his identity, hide at an unidentified mosque for 48 hours after the attack, drop a bomb in a backpack onto the track itself, and schedule the attack for approximately ½ hour before midnight on New Year's Eve. Ex. II.F-1, at pp. 3-5.  Teausant confessed that while he (he said) knew how to build a bomb, he had not actually done it before, and did not want to chance failure on his "first go at it."  Ex. II.F-1, at p. 6.  UCE1 told Teausant that he can could get the actual explosive material, but the rest (*i.e.*, building the actual bomb) would be up to Teausant. Ex. II.F-1, at p. 7.

Teausant explained that his goal was to make America feel "unsafe" so the government would bring U.S. troops home, thereby giving the "brothers" overseas safety and a break.  He and suggested doing "several small things every couple of months … even if you just did a freaking bus."  Ex. II.F-1, at p. 8-9. Teausant also told UCE1 that before he did anything he would "wipe out [his] hard drive."  Ex. II.F-1, at p.10.  After this meeting, Teausant ceased contact with UCE1, for reasons made clear later.

On December 23, 2013, Teausant texted the CHS stating that the New Year's plot was not going to proceed, because "we got tipped off…."  PSR ¶  24.  His general feelings about New Year's Eve, however, did not appear to change, as he posted to Instagram on December 31, 2013:

---

[10] Teausant also made clear that when he said "firework" online he meant "explosive." Ex. II.F-1, at p. 2 ("I say firework just to be safe.").



Jihad is mandatory for able bodied men of age!! #jihad

NT-0739-0740.

G.  **January 2014:**
    **The CHS Asks Teausant Which of the Many Ideas He's Espoused He Really Wants**
    **to Do, and Teausant Returns to his Desire to Fight in Syria**

On January 1, 2014, Teausant texted the CHS about a terrorist who had gotten caught.  PSR ¶ 24.  Three days later, Teausant and the CHS met in Stockton, California.  Teausant said that he saw similarities between how the individual he texted about on January 1st had gotten caught and his interactions with UCE1, so he had cut off contact with UCE1.  PSR ¶ 24.

The CHS told Teausant it was not clear that he was serious about anything, given the number of ideas he threw out.  Teausant responded that he wanted to fight in Syria, and that he needed to get his passport, would travel through Canada, and would get to Canada by Greyhound bus, rather than trying to travel to Syria directly from the United States.  PSR ¶ 25 & Ex. II.G-1, p. 5.

During this conversation, Teausant volunteered that he didn't "fear imprisonments," but feared "the inability to act while in prison," continuing "the most they could send me is fifteen years.  I'd be out when I was thirty-five."  PSR ¶ 25 & Ex. II.G-1, p. 10.   The CHS asked "Do you think they're going to let you out in fifteen years?" and Teausant responded, "Federal law says they have to."  PSR ¶ 25 & Ex. II.G-1, p. 4.   While we do not know where Teausant got his information, he was, of course, right.  18 U.S.C. § 2339B(a)(1) (amended June 2, 2015, 129 Stat. 300, to 20 years).

The CHS asked who he wanted to fight with.  Teausant responded "I liked ISIS."  "Huh?" the CHS responded.  "ISIS," Teausant said, "Islamic State of um-crap I forget.  Islamic State of Al Sham."  PSR ¶ 25. The CHS noted that there were other groups out there, too and told Teausant again to think about

whether he wanted to proceed.  Teausant responded, "Well, you know if you tried to stop me I'd find another way around you …. From just knowing me that if someone tried to stop me, I'd find my own way to do it."  PSR ¶ 25.  The CHS reiterated that Teausant should be certain about what he wanted to do. Teausant said he would take time before answering to satisfy the CHS.  PSR ¶ 25.

The CHS advised Teausant not to discuss his plans with his mother, and Teausant said he did not, but continued:  "she's still a kuffar.  I hate to say it, if I ever needed to, I would do what I needed to do." The CHS asked what that meant, and Teausant responded:  "I would kill her.  I love her, but she's still a kuffar."  The CHS posited that Teausant could just tie her up and lock her up until he (Teausant) left the country, and Teausant responded, "It's just easier to put a bullet in the head…. If you tie someone up, then you got to worry about them screaming or [UI] sooner before you get there."  Ex. II.G-1, p. 6-7.  On January 7, Teausant called the CHS and told him, "you know my answer, I'm ready."  Ex. II.G-2.

### H.    February 2014: Teausant Continues Pursuit of to His Plan to Fight in Syria

Teausant and the CHS met on February 1, 2014.  *See, generally,* PSR ¶ 27.  Teausant advised he had found his passport, which expired in April, and had applied for a new one.  He indicated that he could get it in less than six weeks, but had not asked for it to be expedited because he did not want to explain why he needed it earlier, continuing "call up the FBI, like 'why do you need your passport so soon?', 'Oh, you know I planned on uh-betraying you, killing you, bombing you.'"  Ex. II.H-1, pp. 2-3.  He described his plans for travel, including that he would be calm, dress as a non-Muslim (in his words, he wouldn't "wear my Muslim clothes," or "dress up like a Paki"), he would wear a pop culture t-shirt, and try to look like an American college kid.  Ex. II.H-1, pp. 3-6.

Teausant continued that he wanted to travel when he had a two-week break in his semester because he could claim to his mother that he was going snowboarding with a friend in Canada, providing a cover story for why he needed his passport.  Ex. II.H-1, pp. 6-7.  The CHS told Teausant again that he needed to be certain of his plan, and the two would remain friends regardless.  PSR ¶ 27. Teausant responded that he would smuggle himself out of the United States if he could.  PSR ¶ 27.

The CHS again inquired who Teausant wanted to fight with, getting the response, "ISIS."  He said that ISIS "follow[ed] the Sunnah," and that he did not want to "join the Taliban because … they more or

less follow whoever's paying them and giving them weapons." Ex. II.H-1, p. 8.  He continued, "It's like you want to fight for the cause but still represent a group that's actually meaningful and is following it correctly." Ex. II.H-1, p. 9.  The CHS asked what Teausant wanted to do when he joined ISIS and Teausant said he wanted to make a video like those he'd seen of other converts who had joined ISIS.  Ex. II.H-1, pp. 10-12.   He said he could help ISIS with their media, describing ISIS videos with a fighter speaking with his face covered, but continued that "I'm going to be like the one white devil that leave their face wide open to the camera."  Ex. II.H-1, p. 12.

The two met again on February 10, 2014.  Teausant  told the CHS he was never coming back to the United States, and that "I'd rather this place burn to the ground than come back." Ex. II.H-2, p. 2.   The CHS later said that someday, after his trip, Teausant could potentially work as a facilitator.  Teausant rejected the idea, saying he planned on staying in Syria and "being on every news station in the world," continuing, "I want my face on FBI's top twelve most wanted.  Because that means I'm doing something right."  Ex. II.H-2, p. 3.

The next day, Teausant advised the CHS that he had found an Amtrak ticket to Vancouver for approximately $100 on either March 14 or March 22, and that he planned to get the money by working in the shop in which they'd originally met or for posting furniture ads.  Ex. II.H-3.  He told the CHS on February 13 that he was leaving for a trip to Disneyland and expected to get $200 from furniture ads before he left, and told the CHS about what he planned to take with him to Syria, including sturdy gloves, boots, and pants, a first aid kit, and a "Christian Bible" and "Christian sweater" to avoid suspicion in the airport when he traveled.  Ex. II.H-4.

On February 22, 2013, Teausant and the CHS met.  Teausant told the CHS that he had his bags packed already, and was keeping up on a number of ISIS's pages on Facebook.  PSR ¶ 28.  Teausant said he was eager to travel because ISIS was "planning a huge offensive attack on [the Free Syrian Army] in two weeks…. I just keep up on everything they do."  PSR ¶ 28. In fact, during this time period, ISIS and the FSA were engaging in increasingly open and hostile warfare against each other.[11]

---

[11] http://www.nytimes.com/2014/01/13/world/middleeast/syria-rebels-turn-against-most-radical-group-tied-to-al-qaeda.html?_r=0; http://www.pri.org/stories/2014-02-10/new-frontline-documentary-covers-second-front-syria-between-rebels-and-jihadists; http://www.wsj.com/articles/SB10001424052702303870704579298851707261542.

The CHS again emphasized that Teausant needed to be sure he was making the right choice. PSR ¶ 28.  Teausant told the CHS that he had "prayed about it" and his resolve was "pretty clean cut."  PSR ¶ 28. He continued, "And I don't fear death, I welcome it.  Not suicide but I welcome it because I'll be in a much better place."  PSR ¶ 28.

The CHS asked what Teausant wanted the CHS to tell the UCE2 about him.  Teausant started off flippantly saying he like penguins and the color turquoise.  He continued, "I'm joking. Well, you can always tell him - I think what he fully needs to understand is that, yes, you see my funny side but I have a very serious military side."  Ex. II.H-5, pp. 2-3.  He told the CHS that he didn't get "squirmy" when he saw blood, and that he had significant military skills.  Ex. II.H-5, pp. 2-3.

The CHS ended the meeting by reiterating the theme that Teausant had a choice about proceeding. PSR ¶ 28.  Teausant responded again, "I already chose. I know you're making sure and everything constantly, but it still kind of feels like you're, like, trying to push me not to."  PSR ¶ 28.

**I.     March 2014:**
        **Teausant Meets UCE2, Buys His Ticket, and Travels**

1.     **The Meetings**

On March 5, 2014, the CHS introduced Teausant to UCE2, referred to by the CHS as his "mentor." PSR ¶ 29.  Teausant and UCE met alone.  UCE2 advised Teausant that he had heard about him from the CHS, but wanted to hear from Teausant himself.  PSR ¶ 29.  Teausant first said that he had just been discharged from the U.S. Army and had skills that most "brothers" wouldn't, then said "I'm very, very supportive of ISIS.  I believe that they fight based upon the Sunnah and that without help from the West, that they are always calling for, more brothers won't come.  So, if one starts, maybe more will come."  Ex. II.I-1, p. 2.  UCE2 asked Teausant why he chose ISIS.  He responded:

> They stood out because um -as I know, you've seen the videos that I took off my Google Plus of, uh-FSA and ISIS that were fighting together before FSA betrayed us but-um-ISIS was one of the first groups I ever heard about actually. Before, when I was Christian, and I did a research paper on them because we had to do, as they called it, terrorism, which it's not but-as they called it then and then we had to do research papers and we all got different groups. So, I had to research ISIS, the Islamic State of al sham and Levant and um-I found that they were fighting based on what the Quran was saying whereas groups like al Qaeda were receiving aid from the West and it didn't make a whole lot of sense to me for fighting for a group that's getting paid by the people they're trying to fight.

Ex. II.I-1, p. 3.

UCE2 talked with Teausant about two types of jihad, internal and external, the physical fight. He advised Teausant that external jihad was "a physical war," that Teausant would be "shooting people," and the battlefield was chaotic, without defined lines and that women and children were killed. "I want you to know that that's what you're getting into. You understand me?" UCE2 asked. Teausant responded, "Akhi [brother]. I've been trained to kill, I've been trained to handle stress, I've been trained to shoot." Ex. II.I-1, pp. 3-4.

UCE2 told Teausant they would meet in two days, and told Teausant to call the CHS if he changed his mind about proceeding. This prompted Teausant to complain again that the CHS was trying to talk him out of things, "I've told [the CHS] numerous times-because he, like you, has made sure I've understood what I was going – wanting to get into. He, like you, has asked me many times, 'Are you sure? Are you sure?' and it got to the point where I looked at him- seriously looked at him in the eyes and said, 'I'm ready, you really need to stop asking me if I'm sure.'" Ex. II.I-1, p. 5.

Afterward, Teausant recited his recollection of the meeting to the CHS, describing UCE2 as "serious …, but not like overbearing serious." He summarized his take on why he joined ISIS and his own take on why he wanted to engage in jihad, "I said, 'If one brother doesn't answer their call from the West, then no one will.'" Ex. II.I-2, pp. 2-3.

Later that day, Teausant texted the CHS that if UCE2 gave the green light, Teausant would sell his laptop to raise funds for the trip. Ex. II.I-3. The CHS texted Teausant on March 7, 2014, advising that the CHS had a friend who might be interested in the laptop, and that Teausant should text the friend directly to arrange the sale.[12] Ex. II.I-3.

Two days after their initial meeting, March 7, 2014, UCE2 and Teausant met at a park in Stockton, California. UCE2 asked if Teausant still wanted to join the "brothers of ISIS." Ex. II.I-4, p. 2 & PSR ¶ 30. Teausant said yes. UCE2 told Teausant to purchase a ticket for departure on March 22, indicating that the logistics for the earlier date were not good. He advised Teausant and to let him know when Teausant had the ticket in hand. Ex. II.I-4, p. 2 & PSR ¶ 30. Teausant volunteered his "Battle Book," a

---

[12] Although it is not clear how she became aware of the laptop plan, Teausant's mother told him on March 6 not to sell that computer. II.I-7, p.11.

notebook issued by the U.S. Army National Guard, in which Teausant took notes that he described as "battle tactics" for invading a city and setting up a "command point."[13]   UCE2 asked if the book was for the mujahedeen, and Teausant said yes. Ex. II.I-4, p. 3 & PSR ¶ 30.

After the meeting, Teausant called the CHS to tell him that UCE2 had given the green light. Ex. II.I-3. Teausant texted the CHS that the CHS's friend had agreed to buy the laptop for $150 and Teausant's friend would beat that price, but Teausant had decided to honor the deal and told his friend no. Ex. II.I-3. Teausant and the CHS met on March 8, 2014, to exchange the laptop and funds. Ex. II.I-5, p 2. Teausant confirmed that he had reset the factory settings and "swiped out the hard drive" so no one could see what he had previously searched. Ex. II.I-5, p 2.[14]

The CHS offered to drive Teausant to the bus station to get his ticket, and Teausant accepted.   Ex. II.I-5, p. 3 & PSR ¶ 30.  Teausant went in alone to purchase the ticket, but when he returned reported that he could not buy the ticket for international travel in person, but had to do it on line.  PSR ¶ 30.

On March 10, 2014, Teausant texted the CHS that ticket prices had gone up for March 22, but he had enough money for a March 15 departure, and asked if the CHS knew anyone that wanted a pair of $300 headphones for $250.  The CHS replied that Teausant could not travel on the earlier date, and suggested trying Craigslist for the headphones. Ex. II.I-6 & PSR ¶ 30.  Teausant said Craigslist would take too much time.  Meanwhile, Teausant messaged his cousin on Facebook saying he needed money quickly and was trying to sell his headphones because he needs money "bad now." Ex. II.I-7, p 2.  He declined to say why he needed the money so badly, but said he was thinking about robbing a gas station to get the money.  Ex. II.I-7, pp. 2-9.

Teausant did not rob a gas station or, apparently, sell his headphones.  What he did instead was purchase a ticket for March 15, 2014, in direct contradiction of the instructions of UCE2 and the CHS.  He texted pictures of his tickets to the CHS on March 10, 2014.  PSR ¶ 30.

In this period, Teausant continued his social media postings.  On March 9, 2014, he wrote on Facebook: "The people you call terrorist aren't really terrorist they are just doing what your to afraid to do,

---

[13] The notes in this book were minimal and unremarkable.

[14] The friend was an FBI agent, and forensic analysis of the computer showed that it had been reset, but not all information was wiped.  Complaint, ¶ 40.  Among other things, evidence of past searches was found relating to how to build a bomb and where to buy an ISIS flag. PSR ¶ 36.

the government fears these people and that's why they are called terrorist."  Ex. II.I-7, p 1.  On March 13,

2013, he posted the following on Instagram and Facebook:



Instagram caption:

Let's make some art... #kuffar #jews #muslim #AllahuAkbar
#mashAllah #alhamduilliah #killthekuffar #lol #jj #hellyeah
#instagram #instapick

Facebook comment:

Hey kaffir...lets make some art.. Lol #jews

 NT-666-667; NT-1086.

      Meanwhile, Teausant was attempting to make arrangements for his surreptitious departure, asking

his cousin if he could stay with him from midnight on Friday to 9:30 p.m. on Saturday (approximately one

hour before his train was due to depart for Canada).  Ex. II.I-7, p 10.  That apparently did not work out for

him.  On March 14, 2014, the CHS texted Teausant to confirm their pre-travel meeting the next day.

Teausant responded that he had already left his house and was sleeping under a bridge the night before his

planned travel.  Ex. II.I-9 & PSR ¶ 30.

      Earlier that day, of course, Teausant spoke to a reporter on the Delta College campus regarding a

controversy over an individual purportedly inappropriately wearing U.S. military clothing.  Teausant

falsely claimed to be a member of the U.S. Army who expected to be deployed just after he finished the

semester at Delta College, and expressed some displeasure with anyone who would claim to be associated

with the military when they were not.[15]

---

[15] http://legacy.abc10.com/story/news/local/stockton/2014/03/17/video-nicholas-teausant-
california-al-qaida-terrorism-suspect/6542359/

2.      **The Travel**

On Saturday, March 15, 2014, the CHS and Teausant met one last time.  Teausant told the CHS that he had slept outside the night before.  PSR ¶ 30.  Teausant told the CHS that he could "do it on his own" for a week, meaning he could survive in Vancouver until UCE2 was ready for him.  Ex. II.I-9.  At approximately 11:20 p.m. on March 15, 2014, having left his home approximately 24 hours earlier, Teausant started his trip from Lodi, California, with an anticipated arrival of approximately 24 hours later.  Complaint, ¶ 44.

Once he began his trip, Teausant's phone showed a spate of calls between him and his family members, with a number of "missed calls" from his mother, grandmother, and father.  PSR ¶ 31.  As Teausant later told investigators, his mother and father asked him not to go, told him they loved him, and offered him a plane ticket to go live with his father if he would get off of the train.  Ex. II.I-10, p. 2-5 & Ex. II.I-7, p. 12 & PSR ¶ 31.   He said he knew if he "thought about it too much," he would stop, call his family, and "try to get home.  I knew that but I was also committed to go so … I just turned off my phone."  Ex. II.I-10, p. 5.

J.      **March 16-17, 2014:**
        **Teausant is Stopped at the Border, and Interviewed**

At 11:40 p.m. Teausant's bus arrived at the Canadian border and he was pulled for secondary inspection by Customs & Border Protection (CBP).  He told CBP officers that he was going to visit some "Muslim friends" in Vancouver and they would teach each other some things.  PSR ¶ 31. Teausant was interviewed by FBI agents for approximately two hours beginning at 12:03 a.m. on March 17, 2014.

Teausant told agents that he had started talking in the "last year or so" about going to fight in Syria, and that he intended to do so with ISIS, which he claimed was a group just fighting the Syrian government, nothing else.  Ex. II.J-1, pp. 2-4 & PSR ¶ 32.  He identified the ISIS flag (a printout obtained from the computer he sold to fund his trip) as the flag of the group he was joining.  Ex. II.J-1, p. 6.

After denying that he ever intended harm in America, agents asked Teausant about the Los Angeles subway plot.  PSR ¶ 32.  Teausant did not deny his plotting in this regard, but instead responded "Oh.  So that guy [UCE1] was an FBI agent?"  Ex. II.J-1, p. 5 & PSR ¶ 32.  While Teausant claimed that he was intimidated by UCE2 and that UCE2 left him without a choice about his travel, he also said "I

wanted to go so that was no problem hearing that from him." Ex. II.J-1, pp. 15-17.  An agent followed up: "Nobody held a gun to your head?" Teausant:  "Oh good God no.  If someone held a gun to my head, I'd break their arm."  Ex. II.J-1, p. 17.

Teausant acknowledged that UCE2 had advised him of the perils and chaos of the war zone he was trying to enter, but said he just wanted UCE2 to "shut up."  Ex. II.J-1, p. 7 & PSR ¶ 33.  He disavowed his prior statements that he was going to teach fighters in Syria how to shoot, saying that he did not know how to shoot in battle and assumed that "they" would be teaching him how to do that.  Ex. II.J-1, p. 8 & PSR ¶ 33.  He said he wanted to be a personal guard to the leader of ISIS and wanted to help plan the assassination of Syrian president Bashar al-Assad.  Ex. II.J-1, p. 9 & PSR ¶ 33.  He described ISIS's weaponry as AK-47s and rocket propelled grenades and his understanding that ISIS held Syrian government officials as prisoners and hostages for ISIS prisoners held by the Syrian government.  Ex. II.J-1, pp. 10-11 & PSR ¶ 33.  Teausant also acknowledged that his plans would be illegal under Syrian law and, if undertaken in the United States, under U.S. law.  Ex. II.J-1, pp. 13-14 & PSR ¶ 33.

## K.   Teausant's Post Arrest Interest in Terrorism and ISIS

As noted in the PSR, Teausant's interest in jihad continued past his arrest.  In an interview with the Sacramento Bee in August 2014, Teausant continued to endorse ISIS's actions in Syria:  "I mean if they just stay in Syria and stay in their own country and run their country how they want to, I say let them stay and just leave 'em."  Ex.II.K-1 (question:  "knowing what you know about ISIS, you still don't care if it's ISIS that takes over Syria?").

Bureau of Prisons reports document Teausant's attempts to engage with and communicate with other inmates arrested for terrorist-related offenses.[16]  PSR ¶ 4.  He was subject to an incident report for being in an unauthorized area of MDC and communicating with an inmate involved in a similar investigation, resulting in Teausant's placement in the Special Housing Unit (SHU).  PSR ¶ 4.  Another

---

[16] Teausant was housed at BOP's MDC facility from December 2014 to March 2015.  The incident at issue took place in mid-February 2015.  PSR ¶ 3.  As the defense will no doubt note, the other inmate was placed at MDC while on federal pretrial detention due to aggressive behavior at a mental health treatment facility he was residing in as a condition of pretrial release, and had a history of mental health problems and methamphetamine use.  He was convicted of a firearms sale/manufacture crime in another district with shades of Nicholas Teausant, in that the other inmate lied to an undercover officer about his access to, prior history of, and connections for manufacturing and sale of illegal firearms.

1  inmate assaulted Teausant and reported that he had done so because Teausant's "repeated" statements

2  regarding ISIS "taking down America" were offensive to him as a Vietnam veteran.  PSR ¶ 4.[17]

3  ### III.    THE PRESENTENCE INVESTIGATION REPORT

4  The government has no objections to any statements of material fact or policy statements contained

5  in, or omitted from, the PSR, other than as set forth in its Motion to Correct the Presentence Investigation

6  Report.

7  The PSR calculates a base offense level of 26 (2M5.3(a)), with a 2-level enhancement under

8  2M5.3(b)(1)(E), a 12-level enhancement under 3A1.4(a), and a criminal history category of VI due to

9  application of 3A1.4(a).  The PSR assumes a 3-level reduction under Section 3E1.1, and the government

10  hereby moves for the third level under 3E1.1(b).

11  With a total offense level of 37 and a criminal history category of VI, the guideline range would be

12  30 years to life.  However, because the statutory maximum is 15 years, Section 5G1.1(a) operates to

13  establish the low and high end of the guidelines as 15 years.

14  ### IV.    THE SECTION 3553 FACTORS

15  #### A.    18 USC § 3553(a)(1).

16  1.    **The History and Characteristics of the Defendant**

17  As outlined in the PSR, Teausant had a chaotic and less than ideal childhood.  PSR ¶¶ 39-41, 69-

18  75.  His problems with aggression and lying became apparent at a young age.  PSR ¶¶ 79, 99-101.  This

19  habit of lying in a self-aggrandizing fashion was clearly on display in this case.

20  There is no documentation, however, that Teausant ever reported a significant mental health

21  problem before he was arrested.  PSR ¶ 87.  In fact, when interviewed by the FBI, Teausant denied mental

22  health problems:  "Good gracious no.  I'm not – I'm not insane."  Ex. IV.A-1.  He stated only that he was

23  previously diagnosed as "lacking empathy."  Ex. IV.A-1.

24  ///

25  ///

26  _____

27  [17] Another inmate reported similar statements from Teausant, and stated that he was reporting
Teausant's statements in hopes of obtaining leniency in his own sentencing.  In conjunction with other

28  flags that his statement is not reliable, the government does not suggest giving much if any weight to that
inmate's statements.  *See* PSR ¶ 4.

There is no question from the evaluations performed that Teausant suffers from mild cognitive and moderate social impairments, or that medication has a positive impact on his behavior.[18]  PSR ¶ 92. However, nothing in Teausant's history suggests his impairments excuse his behavior in any legal sense.

His impairments also do not provide a basis for excusing his behavior otherwise.  Moderate social and mild cognitive impairments cannot explain a knowing choice to travel to join a terrorist group.  One would hope that continued medication and ongoing mental and occupational therapy could help ensure that Teausant takes a more positive, or at least a substantially less negative, path forward after his imprisonment.

### 2.    The Nature and Circumstances of the Offense

Nicholas Teausant, while young and immature at the time of his crime, is an average young man who thought very hard about what he wanted to do, and did it.  He undertook to join ISIS when ISIS was not well known to the general public.  But that does not mean that ISIS was not well known to Nicholas Teausant.  He was one of ISIS's early social media followers, following various ISIS Facebook pages.  Ex. IV.A-2.  While the more horrifying details of ISIS tactics widely known now may not have been known to Teausant, he certainly knew that ISIS was a terrorist group opposed to the Free Syrian Army and at odds with al Qaeda.  He told the CHS and UCE2 that himself.  And he told the CHS that if one brother answered ISIS's call, maybe others would follow.  II.I-1, p. 2.

Teausant formulated the primary elements of his trip without significant input from the CHS or UCEs; he raised the idea of traveling by bus or train to the Canadian border, he thought about what he wanted to bring on the trip and how he wanted to dress.  Ex. II.G-1, p.5; Ex. II.H-1, pp. 3-6.  He determined to sell his laptop, over his mother's objections, to raise money for the trip.  Ex. II.I-3; Ex. II.I-7, p. 11.  He defied the CHS and UCE2's direction to travel no earlier than March 22, 2014, and booked the trip for when he could afford it.  Ex. II.I-6 & PSR ¶ 30. He looked up how much time he would be looking at if caught and convicted, got it right, and made his decision to proceed knowing exactly what the maximum consequence of his actions would be.  PSR ¶ 25 & Ex. II.G-1, p. 4.

---

[18] While Teausant's initial retained expert provided an opinion that Teausant was schizophrenic, PSR Ex. 7, the BOP's extended analysis of Teausant considered and rejected that diagnosis, PSR, Ex. 8 & ¶ 87.

**B.**   **18 U.S.C. § 3553(a)(2), the need for the sentence imposed—**

1.   **(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

A significant sentence is warranted.  As set forth at length, Teausant was a troubled young man who did his research and made deliberate choices in selecting the most violent terrorist group out of a ISIS, al Qaeda, and the Taliban.  His stated intentions were to become a world famous terrorist.  A brief sentence in this case would not promote respect for the law for either the public in general or for Teausant, who knew the maximum possible penalty for his crime and undertook it anyway.

2.   **(B)   to afford adequate deterrence to criminal conduct;**

As noted above, a short sentence would not deter similar criminal conduct in others.

3.   **(C)   to protect the public from further crimes of the defendant; and**

Here, the government's concern is significant.  Nicholas Teausant, without prompting, proposed numerous violent acts, ranging from shooting his mother and step-father to bombing his daughter's daycare because it was "Zionist," to bombing the Los Angeles subway on New Year's eve (as well as targeting military recruitment stations, embassies, etc.) to joining ISIS in Syria.

The real impediment to his plans was his capacity and skill set, but that may not have stopped him for long.  Faisal Mohammad, the young man who stabbed a number of people at the University of California, Merced, was radicalized by ISIS propaganda, and similarly inexperienced in combat.  Ex. IV-B.2.  But that is small comfort to the individuals he stabbed, and it is no comfort to his family, who lost their son when he was shot by police in the course of his crime.

The government's concerns in this regard are not just what Teausant might do in a rising frustration level to overcome his limited capacity, but also what Teausant might be capable of if he connected with actual terrorists.  He is a pair of willing hands to carry a bomb, so long as he does not have to make it himself.  As he told the CHS and UCE1, he perceives himself as the soldier, waiting to be given orders.  Although the UCEs and CHS declined to give those orders, allowing Teausant to choose his own path, ISIS or a similar group is unlikely to be as restrained.

Whether Teausant could successfully join ISIS overseas on his own,[19] he had the capacity to engage in an attack here and the expressed desire to do so, although his immediate actions were focused on joining terrorist efforts overseas.  Absent significant rehabilitation, Teausant may well remain a threat to himself and to the public.

4.  **(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

While much about Teausant is a mystery, two things are very clear.  First, mental health treatment in a correctional setting has benefitted him.  Second, at the time of his crime, he had few skills enabling him to engage in productive behavior and little to do with his time.  It is the government's position that a significant period of incarceration could be used for occupational and vocational training and any other education he commits to pursue.   Similarly, the Bureau of Prisons is equipped to deal with the types of mental health issues Teausant has displayed.  Ex. IV.B-1.  Thus, a sentence of imprisonment for a significant period of time can provide Teausant with highly-needed training and education as well as mental health treatment.

## C.   18 U.S.C. § 3553(a)(3): the kinds of sentences available;

Under the Guidelines, the only available sentence in this case is a sentence of imprisonment, in addition to a term of supervised release, possible fine, and mandatory special assessment.

## D.   18 U.S.C. § 3553(a)(4)  the kinds of sentence and the sentencing range established for—(A)  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.

As established in the PSR, the sentencing range in this case is 30 years to life.  However, USSG Section 5G1.1(a) establishes that where the statutory maximum is less than the range established by the Guidelines, "the statutorily authorized maximum sentence shall be the guideline sentence."  Here, the statutory maximum is 15 years, 15 years below the low end of the guideline range.

---

[19] It is the government's assessment that had Teausant successfully traveled to Syria, he would more likely have become a victim of ISIS, as a hostage or as fodder for more horrific ISIS propaganda.

**E.** **18 U.S.C. § 3553(a)(6)--the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

Given the provisions of USSG sections 2M5.3 and 3A1.4, any individual found guilty of a violation of Section 2339B, whether attempt, conspiracy, or actuated crime, will have a base offense level of 26, with a 12 level enhancement, and a criminal history category of VI.  Thus, any individual described above will have a guideline range of 360 to life (without acceptance) or 292 to 365 months (with acceptance).  Either is above the statutory maximum of 15 years (180 months).  Thus, regardless of the differences between the individuals' criminal histories and criminal acts, each will have a guideline sentence of 15 years.

**F.** **18 U.S.C. § 3553(a)(7)--the need to provide restitution to any victims of the offense.**

This is not an issue in this case.

## V.   THE GOVERNMENT'S RECOMMENDATION

Nicholas Teausant is a problem.  Despite his relative lack of criminal history, he does have a history of aggression and a demonstrated and extreme interest in violent expressions of jihad that is inconsistent with any of the world's major religions.  The conundrum in this sentencing is striking a balance between very real concerns that Teausant will find a way to express his violent tendencies, whether he is limited to a U.C. Merced-type assault or can find a way to realize his expressed goal of becoming one of the FBI's most wanted terrorists, and recognition of Teausant's background, youth, and mental health issues.  Another factor to consider is how to assess Teausant as compared to others who have been convicted under Section 2339B for completed acts of material support, who successfully made it to join ISIS or some similar group, or who undertook a more disciplined path to support a terrorist group.

Moreover, the government notes that under the guidelines, there effectively is no incentive for or recognition of a defendant's acceptance of responsibility, although a guilty plea under Section 2339B achieves the same significant benefits to the justice system as those USSG section 3E1.1 attempts to reward in substantially all cases of a guilty plea.

On balance, the government believes a sentence of 15 years in this case would not recognize distinctions between Teausant and others who commit similar crimes and, therefore, a sentence of less

than 15 years is appropriate.  However, too brief a sentence would not address real concerns about the danger Teausant presents to the public, concerns that can be addressed not only by a significant period of incarceration and a lengthy term of supervised release, but also by the mental health treatment and occupational or vocational training Teausant can receive in the Bureau of Prisons as well as during his term of supervised release.

For all the reasons set forth herein, therefore, the government recommends a sentence of 9 years' imprisonment to be followed by a 16 year term of supervised release, including all the conditions recommended in the PSR, and with an additional condition requiring use of mental health related medication at the direction of the probation officer in consultation with medical and mental health care professionals.

Dated:  May 10, 2016                                    PHILLIP A. TALBERT
                                                        Acting United States Attorney


                                            By:  /s/ Jean M. Hobler
                                                 JEAN M. HOBLER
                                                 JASON HITT
                                                 Assistant United States Attorneys