HEATHER E. WILLIAMS, #122664
Federal Defender
MATTHEW M. SCOBLE, #237432
BENJAMIN D. GALLOWAY, #214897
Assistant Federal Defender
Designated Counsel for Service
801 I Street, 3rd Floor
Sacramento, CA 95814

Attorneys for Defendant
NICHOLAS TEAUSANT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. Cr. S. 14-0087 JAM |
| Plaintiff, | FORMAL OBJECTIONS AND MOTION TO CORRECT THE PRESENTENCE REPORT |
| v. | |
| NICHOLAS TEAUSANT, | DATE: June 7, 2016<br>TIME: 9:15 a.m. |
| Defendant. | JUDGE: Hon. John A. Mendez |

The defense respectfully submits the following formal objections and motions to correct the PSR:

1. <u>Paragraphs 49-50, page 18</u> (Application of Correct Guideline):

The PSR applies the wrong offense guideline to this attempt crime. Nick Teausant has been convicted of attempting to commit a violation of 18 U.S.C. § 2339B(a)(1). Accordingly, the Guideline analysis *must* first turn to United States Sentencing Guideline section 2X1.1.

The PSR avoids applying the attempt guideline by claiming that this attempt is expressly covered by section 2M5.3. That is incorrect. An attempt to violate § 2339B(a)(1) is not covered in any part of section 2M5.3, and section 2X1.1 specifically lists guidelines in which attempt is covered in its application note (1). Section 2M5.3 is not one of those guidelines. <u>Compare</u> § 2M6.1 ("Unlawful Activity Involving Nuclear Material . . . Attempt or Conspiracy").

Nick Teausant – Formal Objections
-1-

Because this is an attempt charge, and by its very terms section 2X1.1 applies, the guideline analysis must focus on that section. Section 2X1.1(a) sets the base offense level by reference to section 2M5.3. The base offense level for that guideline is 26.

The Court at this point may be asking why it matters whether it starts with section 2X1.1 or section 2M5.3. The reason is that section 2X1.1 considers the inchoate nature of this offense in two ways. First, the specific offense characteristic discussed in the PSR at paragraph 50, cannot apply, especially under § 2X1.1(a). That is because under section 2X1.1 any intended offense conduct must be "established with reasonable certainty." USSG § 2X1.1(a). The specific offense characteristic at 2M5.3(b)(1) does not apply because it provides a 2 level increase only "[i]f the offense involved the provision of (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act. . . ." That increase cannot "be established with reasonable certainty" under 2X1.1. "Speculative specific offense characteristics will not be applied." USSG § 2X1.1, app. N. 2. Accordingly, the base offense level under section 2X1.1 is 26.

Second, section 2X1.1 has a built in reduction for attempts, like this one, that are stopped one step into the process and far from completion. That decrease of three levels applies by the very terms of this guideline. The application of that section reduces the offense level from 26 to 23. Nick Teausant did not "complete[] all the acts [he] believed necessary for successful completion of the substantive offense." Further the circumstances do not "demonstrate that [he] was about to complete all such acts but for apprehension or interruption by some similar event beyond [his] control." USSG § 2X1.1(b)(1).

Nick got on Amtrak and was arrested prior to crossing the border. Even if he had actually been communicating with jihadists (instead of government agents), and those jihadists did everything to help Nick that the government did (buy his laptop so that he had money for the ticket, explain to him how to go, remind him multiple times to renew his passport, claim to take care of everything) he was many difficult steps away from providing any material support. He would have had to cross the border to Canada, get to Turkey on an expiring passport without a

visa without the required visa, get from Istanbul to Turkey's border with Syria, arrange to be smuggled to Syria without any money, make it successfully across that border, and find someone to support without being killed, kidnapped, or scammed. He would have had to do this without speaking Turkish, Arabic, or Kurdish.

*Then* he would have actually had to provide material support. At each step he would have hit against roadblocks, virtual and literal. Nick was an extremely immature and naïve 20 year old at the time, without any experience in international travel, smuggling, warfare, languages, or survival.

On Nick's Facebook page on January 17, 2014 he posted, "Hey Anyone know how long it takes to renew a passport or even how to? I already have an old one I just need to renew it I got invited on an awesome trip and I want to get a head start and get new passport now so yeah!!" Nick never did get a new passport. The passport he brought with him expired a month after his arrest.

Further, there is evidence that at times Nick wanted to get flown overseas to do other things. For example, on Facebook on December 13, 2013, Nick asked "Anyone know how to be able to live in Saudi Arabia?" (Docket 65-1, p. 64). In the comments section, he told friends that he just wanted to "visit for like a month." Elsewhere, Nick discussed visiting Istanbul and going to the Blue Mosque.

This clearly was only the most inchoate of attempts and should be sentenced as such. Section 2X1.1 is intended to apply to Nick's situation where "the arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense. Under such circumstances, a reduction of 3 levels is provided under §2X1.1(b)(1) or (2)." USSG § 2X1.1, Background. The Sentencing Guidelines reflect the realistic policy view that Nick should not be treated the same as someone who completes this offense.

//

//

Nick Teausant – Formal Objections

-3-

2. <u>Paragraph 50, page 18</u> (Objection to Specific Offense Characteristic):

As discussed above, the defense objects to the two-level increase in the offense level under section 2M5.3(b)(1)(E) (as referenced in § 2X1.1). Nick's grandiose statements cannot support this sentencing increase. Nick claimed a lot of things to the CHS and the UCE, many of which were exaggerated and some of which were flatly untrue.

As the government concedes, Nick had no meaningful military training. (Docket 65-3, p. 2, ¶ 13 ["The government agrees that Mr. Teausant lacked formal training in a number of military or martial areas"].) Military records conclusively establish that Teausant enlisted and discharged as an E1—he was never promoted, he did not attend basic training, and his training was limited to a few weekend Inactive Duty Training (IDT) drill sessions in 2012-13, none of which involved training with weapons or combat tactics. It is absolutely clear that Nick has no skill or expertise in firing a weapon or combat tactics. Nick failed out of the National Guard and never went to bootcamp.

According to his National Guard Recruiter, who was present for all of Nick's drill training, Nick did "not get any time behind any real weapon and [did] not get lectures on Basic Rifle Marksmanship (BRM). BRM training is given during boot camp [which Nick did not attend]. Recruits also do not go to any rifle range or pistol range. The only time that any recruit will touch a weapon will be a rubber one. The rubber weapons are called, 'Rubber Duckies.'" (PSR ¶ 103.)

The base offense level is 26 whether under § 2M5.3 or § 2X1.1(a). The specific offense characteristic at 2M5.3(b)(1) does not apply because it provides a 2 level increase only "[i]f the offense *involved* the provision of (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act. . . ." (Emphasis added.) Nick never provided any funds, support, or resources. The guideline clearly focuses on the actual provision of funds or support in the past, and that makes sense because it would be a truly aggravating factor to actually aid a target organization.

The plain text of the guideline provision means that the provision of funds or other material support must have happened. It is in the past tense – "involved." See e.g., Nichols v. United States, No. 15-5238 (U.S.S.C. April 4, 2016)(holding that language that uses the present tense of a verb is plain and does not include past conduct).The Sentencing Commission certainly knows how to write a guideline that captures intended conduct. It makes no sense to apply a 2-level increase for simply thinking about giving material support in the future and then getting on Amtrak.

Further, all of Nick's acts were in connection with government investigators. He never did provide any material support and never could have. General application notes provide that the word "offense" in the guidelines means "the offense of conviction and all relevant conduct under § 1B1.3." USSC § 1B1.1, app. N. 1(H). If relevant conduct includes things that are intended in the future, then perhaps the increase would apply. However, it is clear that relevant conduct refers to things that have happened in the past in connection with the offense. Turning to § 1B1.3(a), specific offense characteristic "shall be determined on the basis of the following: (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant. . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Notably, this guidance does not include anything looking at the future. It does not include acts "attempted," nor "intended" actions. This definition – which focuses on what actually happened -- applies "unless otherwise specified" and nothing in § 2M5.3 includes future conduct. Cf. § 2B1.1 app. N 3 (intended loss). Section 1B1.3, application note 5 also limits the concept of harm to Nick's acts. "Unless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred." Id.

3. Paragraph 51, page 18 (Inapplicability of § 3A1.4):

The adjustment at § 3A1.4 (Terrorism) does not apply to this case. That section provides, "If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism,

Nick Teausant – Formal Objections
-5-

increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32."
It also provides for a Criminal History VI in all cases. Application note 1 to § 3A1.4 states that
"federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5): the crime must be (1) "an
offense that is calculated to influence or affect the conduct of government by intimidation or
coercion, or to retaliate against government conduct"; and (2) listed in section 2332b(g)(5)(B).
Title 18, U.S.C. section 2339B is one of the enumerated crimes. Nick's offense is listed in
section 2332(b)(g)(5)(B), but his offense was not calculated to influence or affect the conduct of
government by intimidation or coercion, or to retaliate against government conduct. Nick's
offense was not calculated to influence or affect anything; it was vague and amorphous. As
documented in the PSR, his professed goals around the time of his arrest were to take on FSA
rivals and die heroically on the battlefield helping Syrians:

> Teausant wanted to leave so soon and Teausant informed the CHS, "the sooner, the better. I mean, especially since uh-especially since they're planning a huge offensive attack on FSA in two weeks." (PSR, ¶ 28.)

> I'm a soldier anyways. Might as well just fight for the side I believe in, I mean - my job more than likely I would die on a battlefield anyway. And I don't fear death, I welcome it. (PSR, ¶ 28.)

> [H]e wanted to help the Syrians. (PSR, ¶ 32.)

Nick's offense conduct – getting on Amtrak in Lodi and heading to the Canadian border – was not calculated to influence or affect the conduct of any government by intimidation or coercion, and it was not to retaliate against government conduct.

The terrorism adjustment has an extreme effect on Nick's sentencing guidelines, especially with respect to his criminal history. It erases the difference between an attempt and a completed act. It also increases Nick's criminal history from I to VI, a jump that is completely irrational and unsupported by any evidence or sentencing factor.

The terrorism adjustment is completely a creature of Congress. The Sentencing Commission enacted it pursuant to a Congressional directive and it has amended it pursuant to other directives. When the Sentencing Commission fails to fulfill "its characteristic institutional

role" of developing a particular guideline, or its later amendments, based upon empirical data, national experience, or some rational policy basis, the district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." United States v. Kimbrough, 128 S. Ct. 558, 575 (2007); Spears v. United States, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

The reason that Sentencing Guidelines can be relied on in some circumstances is because they are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. Rita v. United States, 551U.S. 338, 349 (2007). However, the Commission did not use this empirical approach in formulating this Guideline adjustment. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 3A1.4, and later § 2M5.3, several times since their introduction in 1987, each time recommending broader application and harsher penalties. U.S.S.G., App. C, Amend. 526 (Nov. 1, 1995); U.S.S.G., App. C, Amend. 539 (Nov. 1, 1996); U.S.S.G., App. C, Amend. 565 (Nov. 1, 1997); U.S.S.G., App. C, Amend. 637 (Nov. 1, 2002).

In 1994, Congress directed the Sentencing Commission to create an adjustment for prison sentences resulting from felonies involving international terrorism. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004 (to be codified at 28 U.S.C. 994). Congress directed that the enhancement apply to crimes involving or intending to promote international terrorism, "unless such involvement or intent is itself an element of the crime." Id. In the wake of the Oklahoma City bombing, Congress directed that § 3A1.4 should apply to domestic terrorism offenses as well. Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730 (to be codified at 28 U.S.C. 994 (2006). Prior to the terrorist attacks of September 11, 2001, there were no base offense Guidelines for federal crimes of terrorism. U.S.S.G., App. C, Amend. 637 (Nov. 1, 2002)(noting that amendments under the USA Patriot

Nick Teausant – Formal Objections

-7-

Act modify existing Sentencing Guidelines "for a number of offenses that, prior to the enactment of the Act, were enumerated in 18 U.S.C. § 2332b(g)(5) as predicate offenses for federal crimes of terrorism but were not explicitly incorporated in the guidelines."). The Sentencing Commission created a base offense guideline for providing material support to a designated foreign terrorist organization in the wake of the attacks of September 11, 2001. Id. But it failed to restrict the sweeping coverage of § 3A1.4, which Congress directed be created as a stop-gap measure to enhance sentences for felony crimes, unless the crime itself related to or involved terrorism. VCCLEA, Pub. L. No. 103-322, § 120004.

Such a massive guideline increase must be applied strictly. As noted above, Nick's offense conduct – getting on Amtrak in Lodi and heading to the Canadian border – was not calculated to do anything. The failure by the Commission to restrict the coverage of § 3A1.4 produces the irrational result that the Guideline for attempting to provide material support to a designated organization is then enhanced for terrorism itself. When combined with § 3A1.4's requirement that every defendant also be placed in Criminal History Category VI, the lowest possible sentencing range is 292-365 months, which includes a three-point reduction for acceptance of responsibility. And yet the maximum penalty authorized by Congress for providing material support to a designated foreign terrorist organization is 180 months, a statutory maximum that will be exceeded by the guideline in every case.

Without this huge adjustment, and with the reduction for acceptance of responsibility, the applicable guideline range under § 2X1.1 at 20/I is 33-41 months. Under § 2M5.3(a) the range at 23/I is 46-57 months. Even adding the 2-level enhancement under 2M5.3(b)(1)(E), the range is 57-71 months, a fraction of that under 3A1.4(a).

4. Paragraph 64, page 19 (Overstatement of Criminal History):

Nick has no prior convictions, arrests, or adjudications. He does not even have a traffic or parking ticket. The PSR correctly finds that he has a criminal history score of zero. However, it recommends that he be treated as a criminal history VI based on USSG § 3A1.4(b). If the Court chooses to apply USSG § 3A1.4(b), we ask that it also apply § 4A1.3(b) to depart back

down to a criminal history I.  All reliable information indicates that a criminal history score of VI "substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  There is no doubt that Nick is the most mitigated in criminal history category I.  His criminal history category of I results from a lack of any prior criminal involvement – not a history of leniency, unscored charges, arrests not resulting in conviction, nor an outdated criminal history.  There can be no doubt that a criminal history category VI substantially overrepresents Nick's criminal history, since he has none but is being placed in the most aggravated criminal history range, usually populated by repeated offenders with a lengthy history of felonies and prison commitments.

Section 3A1.4's placement of all defendants in Criminal History Category VI is not based on a study of the recidivism of those convicted of material support or any other empirical evidence that such offenders be treated as incorrigible recidivist offenders. And it was implemented despite the empirical data and research regarding first offenders such as Nick who would otherwise be in Criminal History Category I. See U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at Ex. 9 (May 2004) [hereinafter Measuring Recidivism Report]; U.S. Sentencing Commission, Recidivism and the "First Offender," at 1314 (May 2004) [hereinafter First Offender Report].  Even if it made sense to dramatically increase the offense level, it makes no sense to treat everyone as Criminal History VI.  Nick has no criminal history at all.

## CONCLUSION

For the reasons above, and for the reasons set forth in the sentencing memorandum, the defense respectfully requests that the Court apply the base offense guideline under 2X1.1, strike the enhancement under 2M5.3(b)(1)(E), and strike the 3A1.4(a) adjustment. The resulting guideline range is 33-41 months.[1]

DATED: May 10, 2016

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

*/s/ Matthew M. Scoble*
MATTHEW M. SCOBLE
Assistant Federal Defender
Attorney for Defendant
NICHOLAS TEAUSANT

*/s/ Benjamin Galloway*
BENJAMIN GALLOWAY
Assistant Federal Defender
Attorney for Defendant
NICHOLAS TEAUSANT

---

[1] The applicable guideline range under § 2X1.1 at 20/I is 33-41 months. Under § 2M5.3(a) the range at 23/I is 46-57 months. With the 2-level enhancement under 2M5.3(b)(1)(E), the range is 57-71.