HEATHER E. WILLIAMS, #122664
Federal Defender
BENJAMIN D. GALLOWAY, #214897
Assistant Federal Defender
Designated Counsel for Service
801 I Street, 3rd Floor
Sacramento, CA 95814

Attorneys for Defendant
NICHOLAS TEAUSANT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:14-cr-087 JAM |
| Plaintiff, | DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| NICHOLAS TEAUSANT, | DATE: June 7, 2016 |
| Defendant. | TIME: 9:15 a.m. |
| | JUDGE: Hon. John A. Mendez |

DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM

# TABLE OF CONTENTS

I.      THE GOVERNMENT AGREES THAT THE GUIDELINES PROVIDE TOO HARSH A PENALTY FOR NICK TEAUSANT .................................................................................. 1

II.     NICK'S ACTS SHOW THAT HE WAS NOTHING MORE THAN AN IMMATURE, ATTENTION-SEEKING BLATHERER WHO WAS NO ACTUAL THREAT TO ANYONE .................................................................................................................................. 2

III.    DESPITE PRODDING, REASSURANCE, AND VALIDATION BY MULTIPLE GOVERNMENT AGENTS, NICK NEVER DID ANYTHING MORE DANGEROUS THAN GET ON AMTRAK ............................................................................................... 8

IV.     WHAT NICK DID – GET ON AMTRAK – PALES IN COMPARISON TO WHAT THE GOVERNMENT HAS GOTTEN SUSPECTS TO DO IN OTHER CASES.................... 11

V.      EVEN THE GOVERNMENT AGENTS WERE NOT CONCERNED ABOUT NICK BY FEBRUARY 2014 ............................................................................................................ 12

VI.     THE GOVERNMENT IS MOTIVATED TO PORTRAY NICK AS A THREAT ........... 17

VII.    A LONG PRISON SENTENCE WILL COMPOUND, NOT FIX NICK'S COGNITIVE AND SOCIAL IMPAIRMENTS ...................................................................................... 22

VIII.   STRUCTURE AND SUPPORT AT HOME WITH HIS FATHER AND STEPMOTHER ARE KEY TO NICK'S REFORM ................................................................................... 24

HEATHER E. WILLIAMS, #122664
Federal Defender
BENJAMIN D. GALLOWAY, #214897
Assistant Federal Defender
Designated Counsel for Service
801 I Street, 3rd Floor
Sacramento, CA 95814

Attorneys for Defendant
NICHOLAS TEAUSANT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:14-cr-087 JAM |
| Plaintiff, | DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING |
| v. | MEMORANDUM |
| NICHOLAS TEAUSANT, | DATE:        June 7, 2016 |
| Defendant. | TIME:        9:15 a.m. |
| | JUDGE:     Hon. John A. Mendez |

## I.   THE GOVERNMENT AGREES THAT THE GUIDELINES PROVIDE TOO HARSH A PENALTY FOR NICK TEAUSANT

The Government agrees that a guideline sentence of 15 years is wholly inappropriate for multiple reasons: (1) the "specifics of this case" (Doc. 66 at 6); (2) a comparison of Nick to others convicted under the same section who committed far worse acts; (3) recognition of Nick's full and timely acceptance of responsibility, which otherwise would not reduce his sentence; and (4) Nick's background, youth, and mental health issues.  (Id. at 25.)  The defense agrees and appreciates the Government's acknowledgement that fifteen years in prison is much too harsh, and that it fails to address the specific facts of this case and Nick's willingness to plead guilty and accept full responsibility.

The Government acknowledges in its very first sentence that Nicholas Teausant is a young man with a troubled background.  (Doc. 66 at 1.)  Although he was an adult in terms of

-1-

Defendant's Response

age, he was clearly a grown-up child, playing with toys, bragging on the playground, and trying to be the toughest kid around.  This is documented throughout his social media, which give insight into Nick Teausant's mixed-up brain.  It is also documented through hours of conversations Nick had with a paid informant and undercover Government agents who were pretending to be his friends.  Months of constant surveillance show that Nick Teausant never *did* anything – until the Government's informant and agents befriended him, validated his most negative impulses, and then betrayed him.  Even what he did – get on Amtrak to head to Vancouver – pales in comparison to what other suspects have done in similar Government sting operations.

By focusing on every negative word Nick has ever typed or said, and ignoring thousands of posts and statements that were innocuous, mitigating, or just plain weird, the Government tries to justify a sentence of nine years in prison.  The Government tries valiantly in its sentencing memorandum to portray Nick as a ticking time bomb, even though he had no weapons and committed no crimes of any kind during five months of round-the-clock Government surveillance.

## II.   NICK'S ACTS SHOW THAT HE WAS NOTHING MORE THAN AN IMMATURE, ATTENTION-SEEKING BLATHERER WHO WAS NO ACTUAL THREAT TO ANYONE

The reality is much more nuanced and complicated than the Government's sentencing memorandum acknowledges.  A sentence of nine years in prison is too severe – it punishes Nick for a small percentage of the cavalcade of wacky thoughts swirling in his head.  It also locks Nick up based on the Government's unsupported speculation that Nick could do something dangerous in an entirely different set of circumstances.

In arguing such speculative dangerousness, the Government seeks to punish Nick for his words – ranting, ridiculous, inconsistent, idiotic, and bombastic words.  However, if forced to talk about Nick's actions, the Government has very little to discuss.  The surveillance shows this.  According to the discovery, the FBI began tracking Nick's movements on October 1, 2013, as teams of FBI Special Agents followed Nick throughout all the mundane aspects of his life.

Defendant's Response

Their surveillance logs document how dull this "terrorism" investigation must have been. They saw Nick ride his bike.  (NT SEN 712.)  He got rides from his mom.  (NT SEN 936.)  Nick went to the mall multiple times.  (NT SEN 712, 807, 840, 937, 974.)  While there he was in and out of stores like Target, Sears, Macy's, Game Stop, Best Buy, and Zumiez.  (NT SEN 877, 893, 979, 1136.)  Nick spent time on campus.  He went to the Delta Junior College student center, library, and bookstore.  (NT SEN 724, 727, 936, 1134, 1165.)  He went to the college's Puente Club wearing lime green shoes and a bright green shirt and looked at a board that had pictures and flyers.  (NT SEN 725.)  He helped the Puente Club set up a booth.  (NT SEN 824.)  He engaged in "some kind of group hug" in the quad.  (NT SEN 735.)  He swam at the college pool, wearing blue swim goggles.  (NT SEN 752.)  He danced and hugged someone on the tennis courts.  (NT SEN 775.)  He played basketball.  (NT SEN 775, 826.)  He went to Starbucks.  (NT SEN 969.)

Teams of FBI Special Agents, some from as far away as San Diego, would relieve each other to ensure they could spy on Nick round the clock at times.  (NT SEN 739, 937, 977, 1084.) When Nick went to Disneyland with his grandmother, whom he called his "Nanny," and his little cousins, the FBI surveilled them the entire way on I-5 into the parking lot of the Howard Johnson Hotel.  (NT SEN 1173, 1180.)  FBI surveillance then caught the family standing in line at the Autopia ride in Tomorrowland, where they waited to drive child-sized cars on tracks.  (NT SEN 1180.)  The next day they went to California Adventure.  (NT SEN 1184.)  They were then tailed back to Northern California on February 17, 2014.  (NT SEN 1186.)



Defendant's Response

1    Back at Delta College, Nick went to the mall (NT SEN 1208), hung out with a guy with

2    green hair and a skateboard (NT SEN 1197), and took money out of an ATM (NT SEN 1208.)

3    During the entire surveillance, Nick was only seen by the FBI going to the mosque once, on

4    December 13, 2013.  (NT SEN 977.)   By the end of February, having tailed Nick to Disney and

5    back, the FBI was clearly tired of following a suspect who was not doing anything criminal or

6    even vaguely interesting.  The last surveillance was on February 24th, several weeks before Nick

7    bought his Amtrak ticket and left Lodi.  Given that the FBI stopped surveillance weeks before

8    Nick even committed a crime, it is a stretch for the Government to argue now that Nick is a

9    likely knife-wielding menace who poses such a danger to society that he needs nine years in

10   prison.

11       Moreover, usually when the FBI uses intensive physical surveillance for months on a

12   suspect in a sting operation it would expect to document something, anything that would justify

13   or support its case.  Despite all the instigation and validation provided by the CHS and other

14   Government agents, Nick never *did* anything that the Government could use as proof or

15   aggravation.  He never got a gun.  He didn't buy military equipment.  He did not attack anyone.

16   He did nothing dangerous or even suspicious during five months of surveillance.  He went to the

17   mall much more often than he went to the mosque.

18       Despite the way that Government agents provoked and validated Nick before carefully

19   backing off to avoid claims of entrapment, Nick never bought a "firework" or acted on what they

20   talked about.  Despite hours and hours of male-bonding over jihad, physical prowess, and iced

21   tea, Nick never did anything.  He did not even manage to do many of the steps that the

22   Government agents told him to – he never properly memorized a prayer, he never applied to

23   renew his expiring passport, he never raised enough available funds to buy a ticket, he did not

24   even buy the ticket they told him to.

25       After months of investigating Nick, the Government had a serious problem in late

26   December 2013.  The conversations about bombing the LA "subway" had turned out to be all

27   talk.  Although one undercover agent had offered to get Nick the explosive material to build a

28   bomb, Nick did nothing.  (NT SEN 81.)  Nick just talked and talked, for hours, but the

-4-

Defendant's Response

1   Government had nothing to show for it.  Accordingly, on January 4, 2014, the CHS and Nick had

2   the following exchange, started by a classic teenage bonding tactic:

3       Nick: What are you thinking about?

4       CHS: Just thinking, bro. Thinking about you, thinking about life, thinking about what

5       you've been up to. A lot of things, man.

6       Nick: **I never think or over think.**

7       CHS: I'm not over thinking.

8       Nick: No, I'm saying like-usually I'm not even thinking about something that we were
    just talking about. Like usually I'll be off thinking about like, "Oh that palm tree really

9       needs to be cut." [Laughter]

10       CHS: That's thinking right there.

11       Nick: Yeah but it's not like-you know how people when they want to have like critical
    like debate discussion-

12

13       CHS: Yeah.

14       Nick: -they'll be thinking about the topic the whole time? I'll be looking out of the room
    thinking about something else and then I'll just respond off the top of my head to

15       whatever question they ask.

16       C: Hm.

17       NT: And it's all of a sudden [UI] I can't think about it, I just-

18       C: Yeah.

19       NT: -**I just told you wanted to hear**.

20   (NT SEN 226 [emphasis added].)  Tired of Nick's talk, the CHS pressured Nick to commit to a

21   plan:

22       I-you know I'm not-I'm not a bull shitter, right. So when I'm telling you that I'm
    here and you know I'm hanging out with you, I-I'm starting to trust you but I just

23       want to know how serious you are about this kind of stuff. Because you're telling
    me that you meet this guy on Facebook, then you're scared, and then you're telling

24       me that you had all these plans and then somehow it conveniently got tipped off,
    right? I mean- . . . I'm not calling you a liar-. . . -but I understand-I'm just saying

25       you know like-how serious are you?

26   (NT SEN 226-27.)  The CHS then repeatedly challenged Nick:

27       CHS: Ok, cool cool. I'm not-I mean look I'm not calling you- . . . I'm not calling you-I'm
    not calling-I'm not calling you a liar.

28

-5-

Defendant's Response

Nick: I know but I figured that would put you at ease more-

CHS: Yeah-

Nick: -if I could actually show you-

CHS: Ok. I'm not-listen I'm not-

. . . .

CHS: -I'm not calling you a liar. I just need to know, that's it. I just need to cover my bases. I cover my bases, alright.

(NT SEN 227-28.)  The subtext to "I'm not calling you a liar but . . ." is "I don't trust you and you need to prove yourself to me."

The CHS then chastised Nick further, "Dude, I don't know man. I don't know if you've [UI] covered your bases-you haven't covered your bases. Like you **got to get a little more serious about this**."  (NT SEN 240 [emphasis added].)  The CHS continues to repeat his doubts about Nick:

- "Again, I don't think you've thought through this."  (NT SEN 241)
- "Well, if you're going to go in jihad, man, you better know how to deal with it."  (NT SEN 275)

During this same conversation, the CHS bonds with Nick over their shared experience of childhood bullying: "Yeah I know.  I know exactly what you mean.  I was uh-a [redacted] kid that got punked in-I was in middle school and - . . . You know, they wouldn't be laughing at me now if they knew who I was. . . ." (NT SEN 276.)  The CHS thus handed Nick a magic opportunity to show every kid who ever bullied him just how tough he is.  Understandably, when the CHS later suggested that Nick was not "ready," Nick had to convince him he was.  (NT SEN 281-82.)

By this time, the hook was set, allowing the CHS to back off in subsequent conversations as he let Nick embed himself further.  (E.g., NT SEN 428, 356.)  During those conversations, the CHS kept promising to let Nick meet his "mentor" if Nick was "serious":

once I see that you're serious and you know how much everything's going to cost, I'm going to introduce you to my mentor.  I want you to look good, right.  You know, by you making yourself-like I'm trying to help you, like, I want you to look

-6-

Defendant's Response

good, right, because **you're my friend and then my reputation's on the line** and you, know, I want you to achieve the goals that you want to achieve.

(NT SEN 356 [emphasis added].)  He held out the prospect of meeting the mentor as "great news" saying "I'm here to support you."  (NT SEN 341.)  He praised Nick's "strategic" thinking:

this is why I believe in you, dude. . . you're an amazing guy because you thought it through.   So-and I just want-you know, I just hope we can get you what you want, you know?  And we just need to do one more meeting, just so I know you have everything in order.

(NT SEN 360.)  Having thus challenged Nick, flattered him, and convinced him to follow through, the CHS could back off and say what was necessary to avoid an entrapment argument: "If it comes out that you don't want to go, right, we'll still be friends, I'll still come visit you, right, we'll still hang out, we'll still talk like normal, we just won't be talking about this stuff." PSR ¶ 28.

The amazing thing is that the Government ever credited a single word Nick said.  Nick – the boy who craved attention and told tall tales all his life – got Government agents to follow him for at least 150 days.  During that time, Nick blew all the money that he was supposedly saving for his journey.  His Instagram feed indicates one reason for his financial insolvency:

 

Date Created  2014-02-26 04:58:42 UTC
      Status  Active
        Text  Bout to be a fun ass day!! #purple #weed #kush #smoke #209
              #California #legal #pothead #cannibas #smokeup #hippie

Defendant's Response

By Nick's return from an uneventful but fun trip to Disneyland, the Government must have gotten nervous that all its work – the hours of monitored conversation and the months of surveillance, the expense of having Nick's personal life monitored – would go up in smoke. So the Government offered to buy Nick's computer on March 5, 2014, so that the plan – so tentative for months – would not fail for want of $120. Nick was a penny-ante terrorism wannabee suspect, arrested because $120 magically fell into his pocket about a month before his passport expired. This paltry financial investment by the Government certainly paled in the face of a collapse in the investigation caused by Nick's inability to get the money prior to the expiration of his passport.

### III.   DESPITE PRODDING, REASSURANCE, AND VALIDATION BY MULTIPLE GOVERNMENT AGENTS, NICK NEVER DID ANYTHING MORE DANGEROUS THAN GET ON AMTRAK

In its sentencing memorandum, the Government drastically underplays the involvement of its CHS and the other undercover agents in stoking Nick. The Government claims that "the UCEs and CHS declined to give [Nick] orders," but ignores that they seduced Nick with the ultimate reward: a gang of bros who would support him in every way.

> CHS: You know why I know you're for real? It's because all the things that you've told me, right, it rings true with everything that I believe in, it rings true what we believe in, and it rings true what every Muslim should believe in and you're doing that. And, you know, I see the dedication in you. That's why I come here, dude. It's not easy coming here and meeting you in person, it takes a lot of time. I'm doing that because I believe in you. (NT SEN 357.)

Even the pages the Government attached to its sentencing memorandum show the way that the CHS goaded Nick on, but the Government does not acknowledge it, even when it is literally on the same page. For example, regarding his mother, the CHS said, "don't . . . talk to your mom about this." Having been warned, Nick then started to spin out: "I'm close to my mom, but I'm not that close. . . She's still a Kufar. I hate to say it, if I ever needed to, I would do what I needed to do."

What the Government tries to ignore is the CHS's next statement, "If it jeopardizes the mission of Allah, **then you do have to do what you got to do.**" (Doc. 67-11 at 8 [emphasis added].) Nick then repeats that almost verbatim, "[if] my mom were to jeopardize something

-8-

Defendant's Response

1   that I had going or - I would do what I needed to do." Id.  Only after being first goaded by the

2   CHS, and then pressed on it – "What would you do?" – does Nick say, "If I needed to, I would

3   kill her.  I love her, but she's still a Kufar." Id. The CHS then responds approvingly:

4   > I had to hear you say it, man, because if you don't say it, you aren't serious about it.
5   > That's what I've seen over my years, the last six, seven, eight years that I've been
>   > Muslim.  You don't say it, you won't do it.

6   Id.  As the conversation goes on, the CHS says, "I'm motivating you.  I want to know you're

7   serious, that's the thing.  Because you get – [UI] you can like anything I can do, I got to do what

8   I got to do.  Ok, I'm going to tie her up and lock her up until I leave the country." Id.  After a bit

9   more discussion in this vein about keeping his mom from finding out, the CHS tells Nick,

10  "Good. . . . Cover your tracks."  (NT SEN 313.)

11      Had Nick actually been dangerous and hurt his mother, this kind of talk would have

12  gotten the Government sued.  However, clearly the CHS and the authorities did not think that

13  Nick was a danger to his mother or to anyone else.  It is inconceivable that if they had believed

14  Nick's ridiculous blather they would have allowed him to continue to live at home with his mom

15  for over three months while they investigated him.  They did not even take steps to monitor Nick

16  in the weeks before his departure.

17      Further events prove that Nick's statements were empty posturing for the CHS.  In early

18  March, Nick's mom did try to get in his way – she forbade him to sell his computer.  What did

19  Nick do?  What any child would do who wanted to get their way.  He ignored her and did it

20  anyway.  Then he got in an argument with his step-father, ran away from home, and slept under a

21  bridge before meeting the CHS one last time.

22      In their final hang-out session the day of Nick's departure, the CHS once again appealed

23  to Nick's desire to belong with promises of "a nice big breakfast with a bunch of brothers just to

24  kind of, you know … it's not gonna be like bam, bam, right into training.  It's like-we-you're

25  going to build some relationships first." (NT SEN 502.)  Later, after Nick stated (falsely) that he

26  blocked his family's numbers on his cellphone, the CHS responded "That's good. So, I mean it

27  keeps you, you know removed from everyone else." (NT SEN-506.)  So while the CHS promised

28

Defendant's Response

Nick bonding and breakfast with his new family of brothers, he sought to ensure that Nick's real family wouldn't get in the way of Nick's arrest, and the informant's payday.

The Government repeatedly pushed Nick not to tell anyone in his family about what he was being recruited to do.

- January 1, 2014, CHS: "don't talk to your mom about all this" (NT SEN 311)
- February 1, 2014, CHS: "yeah you don't want to talk to your mom about this kind of stuff" (NT SEN 150)
- March 5, 2014, "mentor": "We don't discuss this with anybody, OK?" (NT SEN 115)
- March 7, 2014, "mentor": "So again, needless to say, do not discuss this with anyone." (NT SEN 123)

Had Nick been more than an aimless, immature wannabe, he would not have had to be reminded in every meeting not to discuss this matter with others. Especially given his age and immaturity, this deprived him of any voice of reason that could have been a powerful force in stabilizing him at this point in his life.

Subsequent events show that Nick's family could have talked him out of this. Against the direct orders of the CHS and mentor, who told him to block his family's numbers and not use the CHS-provided cellphone to call them (NT SEN 503-508), Nick did reach out to his family to tell him what he was doing while he was on Amtrak. His father nearly persuaded him to turn around and head back to Lodi. His step-mother took a further step and called the Border Patrol to have Nick stopped. Nick later told the FBI agents that after his father tried to convince him to stay, he cried a little bit and tried to distract himself. Nick said, "I knew if I thought about it too much, I would stop and I'd call and I'd try and get home." (NT 598.)  Instead he thought of what the CHS and mentor had promised him, "Once I got with the brothers . . . I'd be – just forget and be fine. I wouldn't have to think about that and they'd take my phone and I wouldn't have to-he wouldn't have to contact me or any of that." Id. This makes it clear that Nick would have had to be firmly controlled and facilitated by his handlers to get any further.

Defendant's Response

## IV.   WHAT NICK DID – GET ON AMTRAK – PALES IN COMPARISON TO WHAT THE GOVERNMENT HAS GOTTEN SUSPECTS TO DO IN OTHER CASES

Nick's case is unique for how ineffective and minor his acts were.  For all his blather and bluster, Nick's real world was steadfastly non-violent and mundane.  Prior investigations involving interest in ISIS have disclosed the multitude of ways that the Government uses paid informants and undercover agents to test the outer limits of what a suspect is willing to do.  In this way, the Government does not have to theorize about a suspect's possible dangerousness, as it does here.  So in John Booker's case, the confidential informants helped Booker build a fake bomb and then accompanied him to detonate it at a military base.  (United States v. John Booker, Cr. 15-40030-CM (D. Kan.)).  Fake bombs also feature prominently in Harlem Suarez's case. (United States v. Harlem Suarez, Cr. 15-10009-JEM, S.D. Fla.)  In that case, confidential informants and undercover agents were involved in multiple discussions culminating in the provision of an inert bomb to the defendant, who was arrested once he took possession.

Confidential informants have also tested a suspect's resolve by having him make recruitment or propaganda videos for ISIS.  (United States v. Suarez, id.; United States v. Amir Said Rahman Al-Ghazi ,Cr. 15-00268-SL (N.D. Ohio).)  Other suspects have bought parts to make bombs and started to put them together.  (United States v. Alexander Ciccolo, Cr. 15-30018-MGM (D. Mass.).)  Another suspect was less interested in bombs, but obtained a fake silencer from the confidential informant.  (United States v. Justin Nojan Sullivan , Cr. 16-0005-MR-DLH (W.D. N.Car.))  Many of the ISIS cases involve firearms, either bought from the confidential agents (Al-Ghazi), bought by the suspect during an investigation (United States v. Christopher Cornell, Cr. 15-0012 –SSB (S.D. Ohio)) or stockpiled at home and found during a search (United States v. Abdul Malik Abdul Kareem, Cr. 15-0707-SRB (D. Ariz.); United States v. Leon Nathan Davis III, Cr. 15-0017-JRH-BKE & Cr. 15-0059-JRH-BKE (S.D. Ga.).)  Many, many other ISIS recruits bought their own plane tickets to Istanbul without help or prompting by confidential agents.  (See e.g., United States v. Arafat Nagi, Cr. 15-00148-RJA-HBS (W.D.N.Y.), United States v. Alaa Saadeh, Cr. 15-00558-SDW (D.N.J.);  United States v. Abdurasul Juraboev et al., Cr. 15-0095-WFK (E.D.N.Y.); United States v. Reza Niknejad, Mag.

-11-

Defendant's Response

1    15-00325-IDD (E.D. Va.); <u>United States v. Leon Nathan Davis III</u>; <u>United States v. Asher Abid</u>

2    <u>Khan</u>, Cr. 15-00263 (S.D. Tex.); <u>United States v. Bilal Abood</u>, Cr. 15-00256-K (N.D. Tex.);

3    <u>United States v. Mohammed Hamzah Khan</u>, Cr. 14-0564 (N.D. Ill.); <u>United States v. Adam</u>

4    <u>Dandach</u>, Cr. 14-0109-JVS (C.D. Cal.).)   Several of them made it there and were arrested

5    overseas or upon return to the United States.  (<u>Khan</u>; <u>Abood</u>; <u>United States v. Tairod Nathan</u>

6    <u>Webster Pugh</u>, Cr. 15-00116-NGG (E.D.N.Y.); <u>United States v. Donald Ray Morgan</u>, Cr. 14-

7    00414-TDS (M.D. N.Car.).)

8           If Nick was so eager to join ISIS or wage jihad, why did it take hours of painfully boring

9    and inane conversation for the CHS to get him on Amtrak?  If Nick was an imminent threat to

10   join ISIS, why did the CHS have to nag him over (NT SEN 280), and over (NT SEN 283), and

11   over (NT SEN 343), and over (NT SEN 361) and over (NT 1965), and over (NT 1948), and over

12   (NT SEN 414), to get his passport straightened out, and then accommodate him when he didn't?[1]

13   If Nick was a dedicated terrorist, why did he blow his money at Disneyland and return empty

14   handed mere weeks before he was supposed to leave?  If going to Syria was a priority, why did

15   Nick waste money on marijuana instead of the ticket he was supposed to buy?

16   **V.    EVEN THE GOVERNMENT AGENTS WERE NOT CONCERNED ABOUT**

17   **      NICK BY FEBRUARY 2014**

18          After watching Nick nearly around the clock for nearly five months, the Government

19   abandoned its surveillance regimen on February 24, 2014, apparently convinced that whatever

20   theoretical threat Nick posed no longer warranted dedication of its resources.  So while the

21   Government argues in its sentencing memorandum that Nick causes the Government's

22   "significant concern" because of "what he might be capable of" (Doc. 66 at 28), they were

23   content to leave him unmonitored for a full three weeks before his departure.  This is because

24   even the Government knew by then that Nick was nothing more than an immature, attention-

25   seeking blatherer who was no actual threat to anyone.

26   _____

27   [1]      The government cites Teausant's claim that he "had applied for a new [passport]," but
28   that was not true.  (Doc. 66 at 18.)  Despite all the efforts of the CHS, Nick never applied for a
     new passport, and he lied to the CHS about it to cover up for his irresponsibility when the CHS
     pressed him on the issue.  (NT SEN 414.)

Defendant's Response

1     The Government even acknowledges Nick's "habit of lying in a self-aggrandizing

2  fashion," but credits Nick's assessment of his own mental health over documented issues starting

3  prior to five years old.  The Government's only evidence for Nick's lack of mental health

4  problems before arrest is that he denied mental health problems: "Good gracious no.  I'm not –

5  I'm not insane."  (Doc. 66 at 21.)  The Government picks and chooses, ignoring that Nick was

6  put in counseling at the age of five to deal with clear mental health issues, likely due to his

7  chaotic home life and being a victim of abuse.

8     The Government concedes that Nick suffers from mental issues and has clearly improved

9  with medication while in custody.  (Doc. 66 at 22.)  However, it cannot concede that Nick's

10  mental health rendered him vulnerable to the tactics of the paid informant without subjecting

11  itself to even more criticism of its failure to target scarce resources against actual threats.

12     Given the tenor of most of Nick's interactions with the CHS, the Government was correct

13  to determine that he was not a danger based on conversations like this one:

14     CHS: Like I said, think about it for a couple days and you're going to get back to me on-
        with your answer?

15

16     Nick: Yes.

       CHS: Ok.
17

       Nick: Have you ever seen Spiderman?
18

19     CHS: Spiderman? Which one?

20     Nick: The one where he became the black Spiderman?

21     CHS: Uh-no I haven't.

22     Nick: And he put the post down-well he put [UI] down because the black Spiderman is
        resistant to uhto like high sounds-

23     CHS: Oh ok, oh yeah- . . . I remember, yeah.

24     Nick: -start dinging them.

25     CHS: Yeah. That's what those poles remind you of?

26     Nick: Yeah.

27     CHS: [Laughter]

28     Nick: They also remind me of the javelin because I wanted to throw it and [Noise] see
        how I could throw it.

-13-

Defendant's Response

CHS: Yeah, let's not do that. [Laughter]

(NT SEN 296.)  Anyone familiar with children has heard exchanges like this one, when one of the children just goes off on a tangent and the adult patiently follows along.

At times, the CHS loses his patience with Nick and just has to challenge him.  This was evidence in the handshake competition discussed in Nick's Sentencing Memorandum.  There is a repeat of this when they come across a fence on the Delta Junior College campus:

CHS:  Having me jump over fences and everything, come on man.

Nick: I guess I'm the one in shape then.

CHS: No, I am in shape.

Nick: I just hop over like it's nothing, you like climb.

CHS: No I just like convenience. [Laughter]

Nick: [Laughter] I like the fastest way there. It don't matter if I have to climb up a mountain. If it's the fastest way in a straight line, I'll go that way.

CHS: Sometimes going around is faster. Sometimes.

Nick: Want to race? [Laughter]

C: No.

Nick: I'll go up the mountain, you go around it.

CHS: Obviously that one is going to be-going around it is going to be a lot faster.

Nick: Going up it.

C: Yeah your-

Nick: Think about it.

CHS: You're going to go-you're going to go up the mountain, go all the way to the summit and then come back down.

Nick: Just sprint down the hill [Noise].

CHS: Dude, there's like cliffs and everything, you have to go around. It-it-it-

Nick: Well you're going to be running so fast-

-14-

Defendant's Response

[OV]

CHS: I-I climb-

Nick: -that you'll jump-you'll jump a forty foot cliff-

CHS: I've climbed-I've-I've climbed before, it takes a very long time to get up.

Nick: I've rock climbed too but-

CHS: Takes a long time.

Nick: My favorite kind of climbing is free climbing.

CHS: [UI] but I'm just going to be in a car dude, going around the mountain.

Nick: Oh no, we're racing. I get to be on foot and you have to be on foot too-

CHS: No, I'm just going to-

Nick: -and we're going to see who-

CHS: I'm just going drive.

Nick: [Laughter] That's no fair.

CHS: Drive around the-drive around the mountain.

Nick: Fine, if you drive around the mountain, I get to ski lift.

CHS: Oh you're going to ski lift up, ok that's fine [UI]-

Nick: Then I'll snowboard down the other side.

CHS: That's if there's snow.

Nick: We're going to go somewhere where's there's snow.

[Laughter]

(NT SEN 301-302.)

   Nick's lack of motivation and flakiness is another sign of his immaturity.  Nick was

repeatedly late to meet the CHS.

   Nick: Yeah, so my mom told me. My cousin was like, "Yeah, Nick someone's here for
   you." I was like, "-?"  He's like, "Yeah." I'm like, "Alright, I'll be out in just a second."

-15-

Defendant's Response

CHS: [Laughter]

Nick: Caught me in the shower. [Laughter]

CHS: Oh yeah? I was calling you, man. You got to be … you got to be more on time. I said one o'clock, I'm on time. I don't run on no Muslim time.

Nick: You said-you said one o'clock and I assumed Paki one o'clock.

CHS: One o'clock-

Nick: One o'clock means one forty five, two o'clock.

(NT SEN 308.)

Nick even failed the final tests the Government gave him.  As discussed above, he called and texted his family from Amtrak even when he was expressly told not to.  The CHS also gave Nick a bag of almonds to give to the mentor.  The CHS told Nick, "this is un-for you to actually bring for the mentor, man. . . . So it will be good. . . . He loves almonds, dude.  Just like-you-you know what I mean, right."  (NT SEN 500-501.)  Nick could not even manage to follow that simple instruction.  During the post-arrest, Nick admitted that he ate the mentor's almonds because he got hungry.  (NT 594.)

The Government struggles in its sentencing memorandum to make Nick seem a serious threat, just as the CHS struggled repeatedly to keep Nick on point.  The Government cites Nick's self-described "very serious military side" (Doc. 66 at 20) but dismisses his very serious love of penguins and the color turquoise as "flippant."  Id.  Nick only said he was joking after the CHS's less than affirming reaction:  "It's an odd thing.  But, hey, to each his own. . . . anything else?  I mean, I'm not going to tell him those things though."   (Exhibit A (audio of this conversation between Nick and CHS, submitted under seal).)   After his pathetic attempt to recover and prove how "very serious" he was, Nick quickly pivoted to a "great engineering lecture" he attended on "multiscale simulations of nano-scale heat transfer." (NT SEN 417.)  The CHS's response, "Stuff I'm not interested in but sounds very smart."  Id.

The Government cites Nick's claim that he had step by step instructions for making the explosive C-4 – details he gleaned from a cable TV show – and his ridiculous recommendation

Defendant's Response

1    that insurgents use bombs that are smaller and, at the same time, more powerful. (Doc. 66 at 10-

2    11.)  These comments are more evidence of Nick's uselessness and detachment from reality

3    rather than any threat he might pose.

4            The Government focuses on Nick's claim to have written "a research paper" on ISIS

5    "when [he] was Christian" in support of the notion that Nick selected ISIS without the CHS's

6    guidance and approval.  (Doc. 66 at 24.)  Of course Nick never wrote any research paper on ISIS,

7    which he first called the "Islamic State of um-crap I forget."  This was just another example of

8    Nick's pathetic efforts to speak authoritatively from a place of almost total ignorance.  Nick

9    didn't learn from a school assignment that ISIS was "a good one" because they fought on the "on

10   the Quran and Sunnah" – he learned that from the CHS (NT SEN 280-281.)  He then parroted

11   the CHS's words back to him and the "mentor" no less than five times over the next two months.

12   (NT SEN 157, 374, 109, 112, 444-45.)

13           The Government notes Nick's December 7, 2013 Instagram post on the "most wanted

14   terrorists" but ignores that Nick deleted this post the

15   very same day after getting negative feedback from

16   others.  In Nick's post-arrest interview, he explained

17   how he would use social media:

> **Id** 605393367776741036
> **Taken** 2013-12-07 03:55:34 UTC
> **Status** 1 - Deleted by user

18       A lot of the posts I've written out of anger in the heat of the moment and then even if
19       you delete it, it's still been there and you can't really delete it. . . . Um-a lot of the
         posts I wrote when I was really angry about something that I read or some post I saw
20       and then like a couple days later I'd see something conflicting with what I had read
         and I'd do the research and found out that it was just some BS thing that they put out
21       there to try and make you hate your own country kind of thing."  (NT 556-57.)

22   Nick used social media and the CHS as friends that he could tell anything to.  When they

23   validated him, he would double down with more and more outlandish boasts.  When they

24   disapproved, he would pull back, or say something else to get approval.  This is clear in

25   his social media, and it is clear in the transcripts.  The Government may not have sought

26   to validate Nick's most negative views, but it did.  It provided an echo chamber for him

27   more powerful than the internet, because that echo chamber could give him rides, keep

28   him company, and tell him that he's amazing.

-17-

Defendant's Response

1

## VI.    THE GOVERNMENT IS MOTIVATED TO PORTRAY NICK AS A THREAT

2

The U.S. Government is in a tough spot in these cases.  It has been repeatedly criticized

3

for using its vast resources to ensnare the mentally impaired in long sting operations led by paid

4

confidential informants.   Francesca Laguardia, "Terrorists, Informants, and Buffoons: The Case

5

for Downward Departure as a Response to Entrapment," 17 Lewis & Clark L. Rev. 171 (2013);

6

Human Rights Watch, "Illusion of Justice: Human Rights Abuses in US Terrorism

7

Prosecutions," (7/21/14): Charles Davis, "Feds make terrible friends: How the FBI encourages

8

people to act their worst," Huffington Post (1/29/2015); Glenn Greenwald, "Why Does the FBI

9

Have to Manufacture its Own Plots if Terrorism and ISIS Are Such Grave Threats?," The

10

Intercept (2/26/15); Trevor Aaronson, "How the FBI Created a Terrorist," The Intercept

11

(3/1715); John Knefel, "The FBI Keeps Overhyping the Threat of Would-Be ISIS Recruits,"

12

New Republic (3/23/15); Nicole Hong, "In U.S. ISIS Cases, Informants Play a Big Role," Wall

13

Street Journal (4/21/15);  Nicole Hong, "U.S. News: Terror Informants Scrutinized," The Wall

14

Street Journal (4/22/15); Warren Richey, "FBI tactics to unearth ISIS recruits: effective or

15

entrapment?" The Christian Science Monitor (9/30/15); Jen Yamato, "How the FBI Seduces

16

Suspected Muslim Terrorists into Extremism," The Daily Beast (10/05/15); Peter Aldhous,

17

"How The FBI Invents Terror Plots To Catch Wannabe Jihadis," Buzzfeed (11/17/15).

18

Yet critics have repeatedly charged that this tactic has failed to get truly dangerous people

19

off the streets.  David Johnston, "9/11 Congressional Report Faults F.B.I.-C.I.A. Lapses," New

20

York Times (7/24/03); Edward Alden, "'Deficient' FBI unable to prevent terror attacks,"

21

Financial Times (4/14/04); Bruce Schneier, "Why FBI and CIA didn't connect the dots,"

22

CNN.com (5/2/13); Adam Edelman, "Sen. Lindsey Graham criticizes FBI for failing to better

23

monitor Boston Marathon bombing suspect," N.Y. Daily News (4/28/13).

24

The best way out of this dilemma in the instant case?  To paint Nick Teausant as a real

25

threat, instead of merely a vulnerable, goofy, virtual one.  Yet, even the Government's skewed

26

and partial reading of the history of this case comes to the conclusion that if Nick had

27

"successfully travelled to Syria, he would more likely have become a victim of ISIS, as a hostage

28

or as fodder for more horrific ISIS propaganda."  (Doc. 66 at 24 n. 19.)  The Government also

-18-

Defendant's Response

1    notes that the "real impediment to [Nick's] plan was his capacity and skill set."  (Doc. 66 at 23.)

2    As Nick first told the CHS on October 24, 2013, "I'll be the pawn.  You just figure out the brainy

3    stuff."  (NT SEN 663-64.)

4          The Government concedes that Nick cannot

5    build a bomb or act as a soldier.  Id.  It is clear that he

6    had nothing to teach anyone.  The Government notes

7    that Nick sold his laptop "over his mother's

8    objections" but fails to acknowledge the irony of a

9    junior jihadi asking his mom for permission in the

10   first place.  (Doc. 66 at 22.)  The Government recasts

11   Nick's inept bungling of his trip date, and inability to

12   follow instructions as an act of defiance instead of an

13   act of cheapness and idiocy.  Id.  The Government

14   notes that Nick planned to wear "a popculture t-shirt,

15   and try to look like an American college kid" or "'a

16   Christian sweater' to avoid detection" at the border



17   (Doc. 66 at 13, 14), while ignoring that what Nick actually wore:  a Muslim skull cap known as a

18   kufi, a neckbeard, a camouflage jacket and camouflage cargo pants with boots.  (NT SEN 1923.)

19   FBI surveillance on the train shows that Nick put on his camouflage getup on the train before

20   getting to Portland, Oregon.

21         That getup, coupled with the fact that Nick volunteered to Border Patrol officers that he

22   was Muslim, and was going to visit some "Muslim friends" in Vancouver and that "his friends

23   intended to teach him some things and Teausant would teach them some things" (PSR ¶ 31),

24   suggest Nick was trying to raise suspicion by this point and get himself caught.  It was certainly

25   a far cry from avoiding suspicion the way the CHS and "mentor" suggested.

26         Nick hung himself on the rope the Government gave to him.  They offered him a band of

27   brothers who would support and accept him unequivocally and he accepted.  If the government

28   had offered Nick training for the zombie apocalypse, he would have been equally enthusiastic:

Defendant's Response

Nick: [UI] the zombie apocalypse, if that ever came out, the only benefit is, the um-everyone would be in really good shape.

CHS: Uh-huh.

Nick: Think about it, the zombies are constantly running, jumping, climbing everything.

CHS: [Laughter]

Nick: So they're in good shape.

CHS: Uh-huh.

Nick: And then the people that are running away from them are running constantly. Their instincts are honed, they're shooting, fighting for their lives, got the constant adrenaline. So they're in really good shape too.

CHS: Uh-huh.

Nick: Like, you're either in good shape or you die and then you get in good shape, so-[Laughter]

CHS: Ah.

Nick: [UI Portion]

CHS: Really?

Nick: They will come-it's in revelations. It talks about how um-[UI] the dead will rise up from the earth-

CHS: Uh-huh.

Nick: And there will be a sickness in the land.

CHS: That would be like [UI], bro. You know [UI], [UI]?

Nick: Not uh.

CHS: Those are the people that Allah has put under these mountains and near the end of time, they will come out, drink the water, and wreak havoc on earth.
. . . .
CHS: You say you want to be in shape, right?

Nick: [Laughter]

CHS: Why don't you wait for these creatures to come out?

[OV]

Nick: I'm already in shape. [Laughter] I've got a perfect six pack, ok. I'm already in shape.

CHS: Yeah.

-20-

Defendant's Response

1    (NT SEN 297-298.)

2         If the Government had recruited Nick for a top secret magic act, he would have been

3    equally enthusiastic:

4         Nick: When I'm in handcuffs, I can dislocate my shoulder, pop my hands in front of me
         and dislocate my thumb and pull my hand out. Cops hate me. When I was in Montana-

5

6         CHS: Oh really?

7         Nick: -I used to just like-I'd be sitting in the back seat like this, and I just go like that and
         dislocate it-[2]

8

9         CHS: Eh, that's disgusting.

10        Nick: -and pull it all the way around in front of me and I sit like this and then I just go
         like this.

11

12        CHS: Eh, that's-

13        Nick: Like that.

14        CHS: Eh.

15        Nick: Like that and then like that.

16        CHS: Oh what the-ah dude what the-that's dis-dude don't like-

17        Nick: And then-

18        CHS: -put it back, dude.

19

20        Nick: Hey-

21        CHS: That is disgusting, dude.

22        Nick: Alright, fine.

23        CHS: Just-yeah-

24        Nick: And then-

25        CHS: Put your thumb back in its socket.

26        Nick: [Laughter] and then I would like-

27

28

───────────────────

[2]      Nick has never been arrested prior to this case.

Defendant's Response

-21-

CHS: Ok.

Nick: -pull the handcuff off.

CHS: Ok. Don't do that in front of me next time, ok?

Nick: [Laughter]

(NT SEN 429-430.)

Really, Nick just wanted to spend time with the CHS, who drove him around, listened to him, and laughed at his jokes:

C: So I-I'll drop you off at your school then?

NT: If you want.

C: Ok.

NT: Or we can hang out more and talk.

C: I actually have to get going so-

NT: Oh ok.

C: Got to-got to meet up with my um-mentor.

NT: Ok.

(NT SEN 449.)  The transcripts are replete with this type of interaction.  The CHS would start to leave and Nick would find another way to prolong the interaction as long as he could.  The Government could have saved money, time, and effort by simply hiring the CHS to be Nick's friend.

## VII.   A LONG PRISON SENTENCE WILL COMPOUND, NOT FIX NICK'S COGNITIVE AND SOCIAL IMPAIRMENTS

As the discussion of Nick's time in BOP indicates, he is a vulnerable target for abuse and opportunists.  (PSR ¶¶ 3, 5.)  While at MDC-LA for psychiatric evaluation, he was attacked by an inmate with a history of violent encounters, including one at a halfway house against staff.  Weeks after the attack, that inmate defended his actions and sought to mitigate them when investigated by the BOP by claiming that Nick had mentioned ISIS to him.  A third-party who

-22-

1   reported the attack to the correctional officers did not corroborate this claim.  (Doc. 65-1 at 71,

2   74-91; 65-3 at 6.)

3          During that same short period of time, another inmate claimed to law enforcement that

4   Nick tried to recruit him and had given him bomb-making instructions.  He immediately asked

5   for consideration from the Government in his pending case in return for cooperation against

6   Nick.  He was unable to produce the instructions he claimed that Nick had given him.  His

7   attempts to cooperate went nowhere, and the Government agrees he is not credible. Doc. 65-1 at

8   24; PSR ¶ 5.  These dangers show that Nick is a magnet for manipulative and opportunistic

9   felons in custody.

10          The Government argues that "imprisonment for a significant period of time can provide

11   [Nick] with highly-needed education as well as mental health treatment." (Doc. 66 at 24.)  That

12   might be true if Nick were destined for a low or medium FCI with plenty of programming and

13   mental health professionals.  Given the charges in this case and this history, it is extremely likely

14   that Nick will be placed in a Communications Management Unit (CMU), as the BOP

15   euphemistically calls its isolation system for inmates convicted of crimes of terrorism.  The BOP

16   claims that CMUs are designed to hold dangerous terrorists and other high-risk inmates who

17   need heightened monitoring of their external and internal communications.  28 CFR § 540.200.

18   The first factor for designation to a CMU is that the inmate's current offense "included

19   association, communication, or involvement, related to international or domestic terrorism."  28

20   CFR § 540.201.

21          As an investigation by the Center for Constitutional Rights found, "Unlike other BOP

22   prisoners, individuals detained in the CMUs are completely banned from any physical contact

23   with visiting family members and friends.  Other types of communication are also severely,

24   limited, including interactions with other prisoners and phone calls with friends and family

25   members."  Center for Const. Rights, "Communications Management Units:  the Federal Prison

26   System's Experiment in Social Isolation" (March 2013) available at http://goo.gl/qjB6k4.  All

27   social visitation is non-contact and family-only, so Nick will be prevented from hugging his

28   family members for the duration of his incarceration. Given the size and restrictions on the

-23-

Defendant's Response

CMUs, Nick will not have access to a full-range of programming.  Nine years in a setting of concrete and steel will be anything but therapeutic for Nick.

## VIII.   STRUCTURE AND SUPPORT AT HOME WITH HIS FATHER AND STEPMOTHER ARE KEY TO NICK'S REFORM

Once Nick is released on supervision he will live with his father and stepmother in their Arizona home.  His father, a graduate student who works at home, will be able to keep tabs on Nick and provide the structure he sorely lacked in early childhood and at the time of this offense. His stepmother, a doctor, will provide guidance and support.  Nick will benefit from counseling, therapy and the medication that has so improved his cognitive functioning.  His father and stepmother have proven that they are responsible parties: Nick's father tried to talk him out of leaving, Nick's stepmother called the authorities to report him before his arrest.

Nick will be supervised by the U.S. Probation Office in that district.  In anticipation of his release, the parties met with a supervisory probation officer and discussed appropriate conditions of supervision.   The conditions of supervision recommended by the parties and probation were developed in that meeting, and a probation officer with a history in Arizona was assigned to write Nick's presentence report in anticipation of his release there.

With support from his family and his probation officer, Nick will reenroll in school and get a job.  He will benefit from exposure to students and coworkers rather than informants, radicals and manipulative felons.  Nick will receive continued therapy and proper medication.

Nick's post-arrest interview shows that he understands how he got caught in this plot:

> And the thing is, I don't even know if God exists.  I was just so angry and feeling so alone that I needed a reason to fight.  I needed something to fight for.  And then when Islam came in and-I've always taken the side-the losing side in an argument just for the sake of fighting back, just for the sake of I'm not going down without a fight.  I don't know [UI] came, I got beat up a lot, that's why I have glasses.

(NT 572.)  Our society is struggling with how to handle young aimless men like Nick.  Nick sought his own solution by trying to join the military.  Having flunked out of that, he was seduced by the prospect of being someone important, adventurous, and respected in another

-24-

Defendant's Response

righteous fight.  Plus, this sting operation came with a built-in friend, who would spend hours with Nick validating him and supporting him.

Nick Teausant was an experiment for the Government.  Could a young, aimless, troubled kid with a big mouth and little insight be turned into a would-be terrorist?  The Government knew that all of Nick's statements were worth nothing if he did not commit an act that would qualify as an attempt to commit a crime.  Now the Government argues that nine years is prison is an appropriate sentence for writing and saying ridiculous things and then getting on a train.  The Government cultivated and validated an emotionally troubled young man and then facilitated his commission of a federal crime.  It surely is allowed to do so.

By working in this way, however, it has defined the outer limits of what Nick was willing to do for a cause.  Those outer limits were very innocuous indeed.  He was willing to take a trip to Canada.  He was not willing to renew his passport.  He was not willing to stop buying marijuana.  He was not willing to get a job to earn money for a plane or train ticket.  In the end, Nick was simply willing to get on a train.  His actions hurt no one, put no one in danger, and victimized no one.  He should not be sentenced as if they had.

DATED: May 24, 2016

Respectfully submitted,
HEATHER E. WILLIAMS
Federal Defender

*/s/ Matthew M. Scoble*
MATTHEW M. SCOBLE
Assistant Federal Defender
Attorney for Defendant
NICHOLAS TEAUSANT

*/s/ Benjamin Galloway*
BENJAMIN GALLOWAY
Assistant Federal Defender
Attorney for Defendant
NICHOLAS TEAUSANT

Defendant's Response